Ronald Bernard BENNETT,
Petitioner—Appellant,

v.

Ronald J. ANGELONE, Director, Virginia Department of Corrections,
Respondent—Appellee.

No. 95–4004.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1996.

Decided Aug. 20, 1996.

**ARGUED:** Donald Robert Lee, Jr., Virginia Capital Representation Resource Center, Richmond, Virginia, for Appellant. Robert H. Anderson, III, Office of the Attorney General, Richmond, Virginia, for Appellee. **ON BRIEF:** James S. Gilmore, III, Attorney General of Virginia, Richard B. Smith, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellee.

Before WIDENER and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge WIDENER and Judge MOTZ joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Ronald Bennett was convicted of capital murder and sentenced to death by a Virginia jury. After exhausting his direct state appeals and unsuccessfully petitioning the Supreme Court of the United States for certiorari, Bennett sought habeas corpus relief in state court. Both the state trial court and the Virginia Supreme Court rejected his claims. After the Supreme Court of the United States again denied certiorari, Bennett filed a federal habeas petition with the district court for the Eastern District of Virginia. The Commonwealth moved to dismiss Bennett's petition, and the district court granted the motion without an evidentiary hearing. Bennett now appeals, raising both substantive and ineffective assistance claims based on the following aspects of the trial and his counsels' various failures to object to them: (1) the Commonwealth's "victim impact" arguments at the guilt phase; (2) the Commonwealth's improper closing argument at sentencing; (3) the trial court's improper jury instructions and verdict forms. Bennett also challenges the constitutional adequacy of Virginia's "vileness" aggravating factor, on which his death sentence was based. Finding no error, we affirm.

I.

Anne Vaden was murdered in her apartment in November of 1985. Her attacker inflicted three types of wounds: blows to the head, strangulation, and multiple stab wounds. Nevertheless, the coroner concluded that she had actually survived the attack—which he estimated lasted at least thirty minutes—but ultimately died from loss of blood. JA at 627. Ms. Vaden was white, but hairs "of Negroid origin" were found at the crime scene; Bennett is African–American.

Police investigated the murder without success for about a year. In December of 1986, Virginia police received a call from California police notifying them of new evidence they had received from Bennett's putative wife.[1] The Bennetts had separated during the year, and Mrs. Bennett had moved to California. After staying out late and drinking with her friend, Sharon O'Shaughnessy, Mrs. Bennett had told O'Shaughnessy that the ring she was wearing had been taken from a woman Mr. Bennett had murdered. Mrs. Bennett then gave the ring to O'Shaughnessy for safekeeping. O'Shaughnessy told her ex-husband, a former California parole officer, about the ring, and he convinced her to tell California police about it. After Virginia police were contacted, they flew to California, interviewed Mrs. Bennett, and soon thereafter arrested Mr. Bennett in Virginia. In post-arrest searches, police found an opal ring and a suitcase, both of which had belonged to Vaden.

Bennett was indicted for murder in the course of robbery with a deadly weapon—a capital offense, robbery, and burglary. Two defense attorneys were appointed to assist Bennett. Both had substantial criminal defense experience.

---

1. Apparently, the Bennetts had gone through a marriage ceremony in California, but Mrs. Bennett had never actually been divorced from her previous husband. The validity of the Bennett's marriage became a pivotal issue at trial, because if they were not married, Mrs. Bennett, the Commonwealth's most damning witness, could be required to testify. After battles in the California courts, the Virginia trial court ultimately allowed the Commonwealth to call Mrs. Bennett.

At trial, the Commonwealth's opening statement described in moderate detail Anne Vaden's good qualities. The Commonwealth then presented, *inter alia*, testimony from Mrs. Bennett and Bennett's cousin, Kenneth Harris. Both told how on the night of the murder, they had been at a party with Bennett, but that he had later left by himself. Both then explained that when Bennett returned to his apartment the next morning, he was "covered in blood" and, at some point, had acknowledged killing Anne Vaden. There also was evidence that Bennett worked at Vaden's apartment complex, that he had duplicated a master key that would let him into her apartment, and that he had once met Vaden while doing maintenance work in her apartment.

Bennett's lawyers put on no evidence. The jury convicted Bennett of the murder, robbery, and burglary charges.

The capital sentencing hearing took place the next day. At the hearing, the Commonwealth presented no further evidence, but the defense called Bennett's mother and brother, both of whom testified about Bennett's good personal characteristics—including his filial piety, service in the Army, and activities at church. They also noted that Bennett's father had died about a week before the murder and that his death had deeply affected Bennett.

In his closing argument and rebuttal, the prosecutor made several religiously loaded statements, apparently in an effort to square the death penalty with biblical passages. He also alluded to Lee Harvey Oswald, Jack Ruby, and a series of gruesome murders committed by Muslim sects in 1977. The jury deliberated for less than an hour and returned a death sentence based on the "vileness" of Vaden's murder.

Bennett appealed to the Virginia Supreme Court, alleging various evidentiary errors and instances of prosecutorial misconduct, none of which he contests on this appeal. *See* JA 5 to 52. The Virginia Supreme Court denied his appeal in a published opinion. *See Bennett v. Commonwealth*, 236 Va. 448, 374 S.E.2d 303 (1988). Bennett petitioned for certiorari, but the Supreme Court of the United States denied his petition. *Bennett v. Virginia*, 490 U.S. 1028, 109 S.Ct. 1765, 104 L.Ed.2d 200 (1989).

Bennett then filed a petition for habeas relief in state court. In his state habeas petition, Bennett alleged most of the claims he presents on this appeal, including: (1) his substantive challenges to the Commonwealth's victim impact statements, the Commonwealth's closing argument at sentencing, and the jury instructions and verdict forms; and (2) all his present ineffective assistance arguments. *See* JA 257–58, 227–28, 260–61. Because it concluded that Bennett had failed to raise them on direct appeal, the state trial court dismissed Bennett's substantive claims as procedurally defaulted. JA 263. It also dismissed Bennett's several ineffective assistance claims on their merits. JA 263–65. On habeas appeal to the Virginia Supreme Court, Bennett raised only his present ineffectiveness claims. JA 91–104. That court refused Bennett's petitions for appeal, JA 266, and Bennett again peti tioned the Supreme Court of the United States for certiorari, which it denied. *Bennett v. Director of the Virginia Dep't of Corrections*, 506 U.S. 855, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992).

Bennett then filed with the district court a federal habeas petition, in which he, arguably, raised all his present claims. The district court found that most of his claims had been procedurally barred and dismissed the remainder on the merits. JA 309–55. The district court also denied Bennett's motion to reconsider its dismissal of two of his ineffective assistance claims. JA 337–38. Bennett then appealed to this court, alleging that the district court had erred in dismissing the substantive and ineffective assistance claims described below.

## II.

Before addressing the substance of Bennett's claims, we must consider whether his petition should be dealt with under the recently enacted Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214. Title I of the Act makes numerous changes to the law governing habeas corpus petitions; § 107 of the Act applies specifically to petitions filed in capital

cases, while §§ 101 through 106 apply to all federal habeas petitions. Along with making procedural changes, the Act affects habeas petitions in death penalty cases by narrowing the issues cognizable on federal habeas and by requiring federal courts to give greater deference to state courts' prior resolution of issues presented in these petitions. *See* § 107(a) (except in limited circumstances, federal district court may only address claims raised and decided on the merits in state court); *id.* (cognizable claims reviewed under amended 28 U.S.C. § 2254(d), which requires denial of habeas claims previously decided in state court, unless based on an unreasonable determination of fact or unreasonable interpretation of "clearly established Federal law, as determined by the Supreme Court of the United States."). But, because Bennett's petition was filed well before the Act took effect—the Act was signed into law on April 24, 1996—we face the initial question whether the capital-specific or general portions of the Act apply to this petition.

First, it is clear that we must analyze Bennett's petition under the portion of the Act applicable to capital petitions, § 107(a), because that section specifically states that it "shall apply to cases pending on or after the date of enactment of this Act." § 107(c). But this does not end the inquiry as to what effect the new provisions set up by § 107(a) will have on this petition. Although, as discussed above, § 107 does give greater finality to state courts' resolution of issues later raised in federal petitions, *see* new 28 U.S.C. § 2264, it does so only if the state has established procedures to ensure the appointment of qualified counsel to represent indigent petitioners in state post-conviction proceedings, *see* new 28 U.S.C. § 2261(a)–(c). In other words, the Act establishes a quid-pro-quo relationship: A state seeking greater federal deference to its habeas decisions in capital cases must, by appointing competent counsel to represent indigent petitioners, further en-

sure that its own habeas proceedings are meaningful. *Id.; see* H.R.Rep. No. 23, 104th Cong., 1st. Sess. (1995) (Act creates "quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants."); *see, e.g., Rahman v. Bell*, 927 F.Supp. 262 (M.D.Tenn.1996) (§ 107 does not apply to petitions by Tennessee prisoners because Tennessee has not established the appointment-of-counsel mechanism required by the Section).

Since July 1, 1992, Virginia has required appointment of competent counsel to represent indigent petitioners in its post-conviction proceedings. Va.Code § 19.2–163.7, –163.8. (Michie Supp.1995); *see also* Virginia Public Defender Commission, *Standards for the Qualifications of Appointed Counsel in Capital Cases* (1992). Although the parties dispute whether Virginia's system satisfies § 107's requirements,[2] this dispute is irrelevant because, whatever the merits of the Virginia system, it was not set up until after Bennett's Virginia habeas petition had been finally denied by the Virginia Supreme Court. Accordingly, we conclude that Virginia's disposition of Bennett's petition should not receive the added deference afforded by the Act, because, by the time it denied his petition, Virginia had not yet set up the appointment procedures the Act requires as the price of deference. Thus, applying § 107 to Bennett's petition would upset the "quid pro quo arrangement" the Act was supposed to establish.

█ Having decided that the capital-specific provisions of § 107 do not apply here, we still face the question whether the Act's other habeas provisions might still apply to Bennett's petition. Unlike § 107, the general habeas petitions, §§ 101 through 106, are not specifically made applicable to petitions pending when the Act took effect.[3] Because

---

**2.** As Bennett points out, the Virginia statutes and regulations do not specifically provide for compensation or payment of litigation expenses of appointed counsel, as § 107 requires.

**3.** In the few months since the Act's passage, courts have divided as to whether the Act's general habeas provisions should apply to claims

pending as of the date of enactment. *Compare Leavitt v. Arave*, 927 F.Supp. 394, 396 (D.Idaho 1996) (non-capital amendments have no retroactive effect, thus may properly apply to pending petitions) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)), *with Warner v. United States*, 926

we would deny Bennett's petition under pre-Act habeas law, we need not decide how we would treat the petition under the more deferential standards of review set up by the Act. *Cf. Sherman v. Smith,* 89 F.3d 1134, 1142 n. 1 (4th Cir. 1996) (en banc) (deferring question of "whatever additional hurdles [petitioner] might face under the Act" because petition denied even under pre-Act law). Accordingly, we will analyze Bennett's claims as if they were not subject to the Act.

## III.

Bennett bases his various claims on four aspects of his trial and sentencing that he asserts were defective. He claims: (1) the Commonwealth made improper opening remarks during the guilt phase; (2) the Commonwealth made improper arguments to the jury during the sentencing phase; (3) the jury instructions and verdict forms used at sentencing were defective; and (4) the "vileness" aggravator used in Virginia's capital sentencing is constitutionally inadequate. From these asserted problems, Bennett fashions two parallel sets of claims. First, he asserts that each of these substantive defects constitutes a due process violation that invalidates his trial and sentencing. Second, he claims that his trial attorneys' failure to object to the first three of these defects amounted to ineffective assistance. Because of the varying procedural postures in which the two sets of claims come before us, we will discuss the "substantive" claims as one group—Section III.A below—and will address the Sixth Amendment claims together in Section III.B.

## A.

Because they were raised in various of Bennett's earlier petitions or appeals, Bennett's substantive claims are in varying procedural postures. We conclude that two of them—his challenges to the Commonwealth's guilt-phase opening statement and to the jury instructions—clearly are procedurally barred; the other two claims—the challenges to the Commonwealth's arguments at sentencing and to the constitutionality of Virginia's "vileness" aggravator—may not be barred, but are, in the end, meritless.

■ Bennett did not challenge the Commonwealth's guilt-phase opening statement or the jury instructions on direct appeal, but first contested them in his state habeas petition. JA 226, 228–31. The court dismissed both of these claims as procedurally defaulted, relying on Virginia's rule that claims which could have been brought on direct appeal, but were not, may not be brought later on state habeas. JA 263 (citing *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974)). Bennett then failed to raise these claims in his appellate habeas petition to the Virginia Supreme Court; that court refused his petition for appeal in a cursory opinion. JA 266.

■ A habeas petitioner is barred from seeking federal review of a claim that was presented to a state court and "clearly and expressly" denied on the independent, adequate state ground of procedural default. *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 2638–39, 86 L.Ed.2d 231 (1985). Furthermore, where several of a state's courts have ruled on a claim, we look to the last state court decision in the case to determine whether it did, in fact, rely on such a state procedural bar. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 2594–95, 115 L.Ed.2d 706 (1991). To do this, we may "look through" later, unreasoned, summary dispositions, and focus on the last *reasoned* state decision. *Id.* Here, the last reasoned Virginia decision in this case was that of the habeas trial court which, as explained above, expressly dismissed Bennett's challenges to the Commonwealth's guilt-phase opening statement and the jury instructions as procedurally barred. Accordingly, Bennett may not now raise those claims in a federal habeas petition. *See Whitley v. Bair,* 802 F.2d 1487, 1500 (4th Cir.1986) ("failure to appeal claims disposed of by state habeas trial court

F.Supp. 1387, 1390 n. 4 (E.D.Ark.1996) (given presumption against retroactivity in face of congressional silence and express language making

§ 107 retroactive, *Landgraf* requires court to treat § 105 as prospective only).

constitutes a procedural bar to further federal review of such claims.").[4]

■ Bennett's other two substantive claims—those attacking the Commonwealth's sentencing-phase arguments and the constitutionality of Virginia's "vileness" aggravator—were never expressly raised before the Virginia courts,[5] either on direct appeal or in any habeas petition. Such claims ordinarily cannot be raised on federal habeas, and are treated as procedurally barred. *See Teague v. Lane*, 489 U.S. 288, 299, 109 S.Ct. 1060, 1069, 103 L.Ed.2d 334 (1989) (rule that state's reliance on procedural bar must be "clear and express" inapplicable where claim was never presented to state court); *Bassette v. Thompson*, 915 F.2d 932, 936 (4th Cir. 1990) (under *Teague*, Virginia habeas petitioner barred from bringing claim on federal habeas that he has never brought in any Virginia court). Indeed, the District Court treated these claim as procedurally barred under this reasoning.

But, as Bennett points out, at least one circuit has refused to apply the procedural default rule to claims that, though not expressly raised on direct appeal, fit into the category of claims for which a state supreme court is statutorily required to review all appeals in capital cases. *See Beam v. Paskett*, 3 F.3d 1301 (9th Cir.1993). In *Beam*, the petitioner had failed on direct review to specifically appeal the trial court's application of the "continuing threat" aggravator to him. Nevertheless, the Ninth Circuit held that, because the Idaho Supreme Court was statutorily required to review Beam's capital sentence to determine if it was infected by "passion, prejudice, or any other arbitrary factor," that. court must be deemed to have implicitly ruled on the constitutionality of the trial judge's application of the "continuing

threat" factor to Beam. Accordingly, the Ninth Circuit concluded, Beam had not defaulted by failing specifically to raise that claim on direct review, hence the claim could be reviewed on federal habeas. *Id.* at 1307 (citing *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (Oklahoma statute requiring its supreme court to review for "fundamental error" in capital cases preserved constitutional errors for direct federal review, despite failure to raise them in state direct appeal)); *cf. Nave v. Delo*, 62 F.3d 1024, 1039 (8th Cir.1995) (concluding that, under *Beam* analysis, challenge to trial instructions not preserved because Missouri mandatory review statute did not require review of trial errors).

Virginia's mandatory review statute—Va. Code Ann. § 17–110.1—is nearly identical to the Idaho statute at issue in *Beam:*

> In addition to consideration of any errors in the trial enumerated by appeal, the court shall consider and determine:
>
> 1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
>
> 2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Va.Code Ann. § 17–110.1(C). Bennett argues that we should follow *Beam* and hold that his present challenges—his attack on the Commonwealth's sentencing argument and his constitutional challenge to Virginia's "vileness aggravator"—are among those necessarily reviewed by the Virginia Supreme Court under § 17–110.1(C), and are thus preserved for federal review.

---

4. Bennett has made no argument that there was sufficient cause for his default; accordingly we do not reach the "cause and prejudice" question. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

5. Bennett did challenge portions of the Commonwealth's sentencing argument in state habeas court; specifically, he claimed that the prosecutor improperly inflamed the jury (1) by comparing his case to that of Lee Harvey Oswald, (2) by

referring to gruesome murders committed by the Hanafi Muslim sect, and (3) by telling the jury that it was like "a commander in the field of battle." JA 227–28. The habeas trial court dismissed these claims as procedurally defaulted. JA 263. Accordingly, to the extent that Bennett tries to challenge these portions of the capital sentencing argument on federal habeas, he is barred under the rules of *Harris* and *Ylst* discussed above.

We need not decide whether this circuit would follow *Beam* under these circumstances,[6] or even whether the claims at issue necessarily fit within the scope of Virginia's mandatory review statute [7]; because we affirm the district court's denial of these claims, we will treat them as if they were preserved.

### 1.

■ First, Bennett contends that the jury instruction defining the "vileness" aggravating factor under which his death sentence was imposed was unconstitutionally vague.[8] But this court recently has upheld the constitutionality of the precise instruction given in this case. *See Tuggle v. Thompson*, 57 F.3d 1356, 1371–74 (4th Cir.), *reversed on other grounds*, —— U.S. ——, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995). Accordingly, Bennett's constitutional attack on this instruction fails.

### 2.

■ Bennett's more substantial argument is that the Commonwealth's religiously-loaded sentencing arguments were "inflammatory, irrelevant, and grossly prejudicial," hence violated his due process rights. While we agree that the arguments were highly improper and deserve strong condemnation, we cannot agree that they rendered Bennett's sentence constitutionally infirm.

■ In analyzing the effects on due process of improper prosecutorial sentencing-phase arguments, we look to see "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." *Lawson v. Dixon*, 3 F.3d 743, 755 (4th Cir. 1993) (citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In making this determination, we must look at "the nature of the comments, the nature and

**6.** In *Kornahrens v. Evatt*, 66 F.3d 1350, 1361–63 (4th Cir.1995), we rejected a petitioner's argument that the South Carolina Supreme Court's mandatory *in favorem vitae* review of his capital conviction and sentence had preserved alleged instructional errors for federal habeas review. We concluded that it was unclear whether, in the course of its automatic review, "the state court has properly applied federal constitutional principles, or for that matter, whether the state court has even considered these issues at all." *Id.* at 1362. But the *in favorem vitae* review rule—which simply required the South Carolina court to review the trial record for "legal error"—was much broader and more nebulous than the Virginia statute at issue here or the Idaho statute in *Beam.* Both the Virginia and Idaho statutes specify what types of errors the state supreme court is required to address on appeal; thus we are not, under these statutes, left entirely in the dark as to what issues the state court reached on review, as we were in *Kornahrens.* Accordingly, although the spirit of *Kornahrens* is counter to that expressed in *Beam,* we do not decide whether the exact holding of *Kornahrens*—that South Carolina's *in favorem vitae* review does not preserve for federal habeas those issues not specifically raised on direct appeal—would apply equally to the Virginia statute at issue here.

**7.** First, neither of these issues was raised by objection at trial. Normally, the Virginia Supreme Court will not review errors not preserved by contemporaneous objection. Va. Sup.Ct. R. 5:25. And the Virginia court has invoked this rule in some capital cases, even as to errors for which § 17–110.1 would require it to review:

In claiming that the death sentence was imposed under the influence of passion, prejudice, or other arbitrary factors, Mickens directs our attention to ... a statement made by the Commonwealth's Attorney in closing argument. However, no objection to the statement was made at trial. Therefore, we will not consider this complaint on appeal.

*Mickens v. Commonwealth*, 247 Va. 395, 442 S.E.2d 678, 689 (1994) (citing Rule 5:25), *reversed on other grounds* —— U.S. ——, 115 S.Ct. 307, 130 L.Ed.2d 271 (1994). But the court has not invoked this rule in every capital case. *See Joseph v. Commonwealth*, 249 Va. 78, 452 S.E.2d 862, 871 (1995) (reviewing on the merits capital appellant's challenge to Commonwealth's opening statement, after noting that appellant "failed to object to any of the opening statement"); *cf. Briley v. Bass*, 584 F.Supp. 807, 816 (E.D.Va. 1984) (discussing § 17–110.1 and noting that Virginia's contemporaneous objection rule applies to "other issues"). Accordingly, it is unclear whether Bennett's failure to object to the vileness aggravator or to any of the Commonwealth's sentencing argument would prevent the Virginia Supreme Court from reviewing alleged errors in the aggravator and the argument on direct review.

**8.** The following instruction was given: "Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt ... 2) That [the defendant's] conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder." JA 794.

quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Id.*

Accordingly, we first turn to the comments themselves. After setting forth the facts of the murder in an entirely proper effort to demonstrate that they were statutorily "vile," the Commonwealth's attorney then made the following statements:

> Some will say that society shouldn't take a life because that's murder also. That's not true. Vengeance is mine saith the Lord, but later when he covered the Earth with water and left only Noah and his family and some animals to survive, when he saw the damage what [sic] had been done to the Earth, God said "I'll never do that again" and handed that sword of justice to Noah.

> Noah is now the Government. Noah will make the decision who dies. "Thou shall [sic] not kill" is a prescription [sic] against an individual; it is not against Government. Because Government has a duty to protect its citizens.

JA 799. On rebuttal, apparently responding to defense counsel's own religiously-freighted argument,[9] the Commonwealth's attorney resumed his religious rhetoric:

> Our Government has decided that the death penalty is legitimate and is morally right. The law says for a wantonly, outrageous, or vile murder, a person may be put to death. When Jesus was being tormented by the Roman soldiers before his death, they asked him jokingly, is it lawful to pay tribute unto Caesar? Jesus said give those things that are Caesar's unto Caesar, and those things that are God's to God.

> The moral being follow the law and leave the rest to Heaven.

JA 806–07.

Federal and state courts have universally condemned such religiously charged arguments as confusing, unnecessary, and inflammatory. *See Cunningham v. Zant*, 928 F.2d 1006, 1019–20 (11th Cir.1991) (improper to compare defendant to Judas Iscariot); *United States v. Giry*, 818 F.2d 120 (1st Cir.1987) (improper to compare defendant's statement to Peter's denial of Christ); *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991) (allusions to Bible in Commonwealth's argument are *per se* reversible); *cf. Bussard v. Lockhart*, 32 F.3d 322 (8th Cir.1994) (quoting Bible acceptable where it is merely for more poetic, but accurate, explanation of state law; distinguishing this from misusing Bible "to invoke the wrath of God ... or to suggest that the jury apply divine law as an alternative to the law of Arkansas"). Here, the Commonwealth's attorney improperly drew on his reading of biblical law to justify the morality of the state's death penalty. Such statements, worthy of the profoundest respect in proper contexts, have no place in our non-ecclesiastical courts and may not be tolerated there.

Nevertheless, we must bear in mind that not every improper trial argument amounts to a denial of due process. *See Donnelly*, 416 U.S. at 647–48, 94 S.Ct. at 1873–74. And, as objectionable and unwarranted as was this argument, we are convinced that, viewed in the total context of the trial, it was not sufficiently egregious to render Bennett's trial fundamentally unfair. First, the evidence of Bennett's guilt was powerful, and there is little doubt that the murder of which he was convicted was a particularly vile one. Next, immediately before the sentencing arguments, the trial

---

9. Defense counsel sought to respond in kind:
 Mr. Watson [the Commonwealth's attorney] has told you that vengeance is mine saith the Lord, and I submit to you that is true because Ronnie will answer for this to someone far greater than this jury, and I would submit to you that the ultimate power of punishment belongs not with this jury, and the concept we have long since discarded of an eye for an eye or tooth for a tooth, that has been replaced since the Sermon on the Mount, and the message we as Christians have been brought up with is even as the only perfect person in the world, as I understand it, hung on the cross between other murderers. The message then, as it still was [sic], was "Father forgive them," do not punish these people for what they do to me. That is the message of a faith.
 JA 804.

court gave the standard instruction, "What the lawyers say is not evidence. You heard the evidence. You decide what the evidence is." JA 796. Thus, we ultimately are convinced that the Commonwealth's improper arguments—though clearly such—did not so infect the sentencing proceedings as to render them constitutionally unfair.

### B.

■ Bennett also claims that his trial counsel were, in various ways, constitutionally ineffective. Specifically, he claims that his lawyers failed him by (1) not objecting to the Commonwealth's allegedly improper guilt-phase opening argument; (2) not objecting to the Commonwealth's sentencing arguments; (3) not objecting to the sentencing instructions or jury forms; and (4) not properly explaining mitigation to the jury at sentencing. We first note that the last reasoned state-court decision to dispose of these federal claims—that of the state habeas trial court—did so on the merits; hence we face no procedural bar to reviewing these claims. *See Ylst*, 501 U.S. at 797, 111 S.Ct. at 2591–92. Nevertheless, we conclude that Bennett's ineffective assistance claims are meritless.

### 1.

■ As a preliminary matter, Bennett claims that the district court erred in failing to hold an evidentiary hearing regarding two of his ineffective assistance claims—those based on failure to object to the Commonwealth's opening and sentencing arguments. Bennett argues that because the trial counsel affidavits the Commonwealth submitted in opposition to these claims are, he believes, in conflict with the facts in the trial record, the district court was unjustified in relying on them and was, therefore, required to hold an evidentiary hearing on these claims. This claim is meritless.

■ Our test for when a habeas petitioner is entitled to an evidentiary hearing is set out in *Poyner v. Murray*, 964 F.2d 1404, 1414 (4th Cir.1992). Under *Poyner*, a habeas petitioner seeking an evidentiary hearing must: (1) allege "additional facts that, if true, would entitle him to relief," and (2) "establish any of the six factors set out by the Court in *Townsend v. Sain* [10] or the related factors set out in 28 U.S.C. § 2254(d)." *Poyner*, 964 F.2d at 1414.

Here, Bennett's claim clearly fails under the first prong of this test. Plainly stated, he has alleged no "additional facts." Unlike the petitioner in *Poyner*, who filed a new affidavit alleging previously undisclosed facts he felt entitled him to relief, Bennett has filed no affidavit or other factual statement that brings his trial counsels' affidavits into question. He simply points to places in the trial record that, he believes, weaken the credibility of those affidavits.[11] Because Bennett's arguments add nothing "additional" to the factual mix already before the district court, we affirm its decision to deny Bennett's request for an evidentiary hearing.

### 2.

■ Bennett contends that certain of the Commonwealth's statements during its guilt-phase opening arguments constituted improper "victim impact" statements and, con-

---

10. The *Townsend* factors are as follows:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963).

11. For example, Bennett claims that his trial counsel were deficient for failing to object to the Commonwealth's improper arguments at sentencing. In their affidavits, the trial lawyers explain that they chose not to object to the sentencing arguments because they thought those arguments would be inconsequential in the jury's sentencing decision and because they did not want to taint themselves in the jury's eyes by appearing overly antagonistic. Bennett claims that the trial record belies this explanation, because his trial lawyers had not been concerned about jury reaction when they objected six times during the prosecutor's closing remarks at the guilt phase.

sequently, that his trial counsel were ineffective for failing to object to those statements. Because we are not convinced that the statements in issue, while not strictly relevant to Bennett's guilt, were genuinely improper, we cannot conclude that they were such that only constitutionally ineffective counsel would fail to object to them. ·Accordingly, Bennett's contention is meritless.

 Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a petitioner claiming ineffectiveness must show that: (1) "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent performance"; and (2) there is "a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 690–94, 104 S.Ct. at 2066–68; *Washington v. Murray*, 952 F.2d 1472, 1476 (4th Cir.1991).

 Bennett claims the following statements by the Commonwealth, to which his trial counsel did not object, were improper "victim impact" arguments:

> Now, that's the Defendant sitting right over there. This is the victim Anne Keller Vaden, attractive, intelligent, successful, and dead. Who was she? Well, in 1975 she graduated from Clover Hill High School as class valedictorian. Two years later she married; she married Joey Vaden. In 1979, she went to college, William and Mary, and had a 3.8 grade average— an intelligent girl. She was also a guest minister at Tomahawk Church in Chesterfield—a guest minister.
>
> I said she was successful. She had a type of real estate venture. She was voted outstanding businesswoman of the year. She finished second in the national oratory contest; that was Anne Vaden.

JA 548–49. Virginia clearly does forbid the introduction of some "victim impact evidence" in the guilt phase of capital trials, because such evidence does not assist in determining the guilt or innocence of the accused. *Weeks v. Commonwealth*, 248 Va. 460, 450 S.E.2d 379, 389 (1994); *McReynolds v. Commonwealth*, 177 Va. 933, 15 S.E.2d 70

(1941). However, the Commonwealth's quick sketch of Vaden's background is a far cry from the inflammatory statements the Virginia court has condemned. *Cf. McReynolds*, 15 S.E.2d at 75 (describing victim's mother "sitting in that humble home, seventy-eight years old, palsied, grieving about the boy that sleeps right up on the hill above the house"); *Dingus v. Commonwealth*, 153 Va. 846, 149 S.E. 414, 414–15 (1929) ("If it had not been for the defendant there firing that shot and killing the deceased, his widow would not be here in mourning weeds."). Furthermore, the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), anticipated that such background information would be admitted during the guilt phase of a capital case. As support for its ultimate holding—that admitting victim impact evidence at the sentencing phase of a capital trial is not per se unconstitutional—the Court noted that various pieces of evidence regarding the victim's background probably would get presented during the guilt phase of the trial. *Id.* at 823, 111 S.Ct. at 2607 (Rehnquist, C.J., for the majority); *id.* at 840, 111 S.Ct. at 2616–17 (Souter, J., concurring). As a result, the Court concluded that it would be anomalous to require strict exclusion of such evidence at the sentencing phase because the jury would already have heard that evidence at the guilt phase. *Id.* at 840–41, 111 S.Ct. at 2616–17. Thus *Payne* suggests that limited victim background evidence may be admitted—indeed, may have to be admitted—at the guilt phase of trial. Accordingly, it is not clear that the Commonwealth's remarks about the victim's good qualities were improper at all.

Given the uncertainty as to the propriety of the Commonwealth's statements, Bennett cannot successfully claim that his trial counsel were ineffective for failing to object to those remarks. Such failure certainly did not depart from established standards of professional conduct, especially when viewed in light of the reasons trial counsel gave for their decisions, namely that they did not want to emphasize this part of the Commonwealth's argument. Such a strategy appears entirely reasonable and, we conclude, did not render Bennett's trial counsel constitutionally ineffective.

**3.**

■ Bennett next claims that his trial counsel were ineffective for failing to object to the Commonwealth's sentencing arguments. Because counsels' failure to object to the statements appears to have been the result of rational—if imperfect—trial strategy and not ineffectiveness, we reject Bennett's contention.

A brief description of the prosecutor's statements is in order. In addition to the improper, religiously loaded statements quoted in Part III.A.2 above, the Commonwealth also alluded to Lee Harvey Oswald and a string of murders committed by the Hanafi Muslim sect. In explaining the role of "vileness" in determining which murders deserved a capital sentence, the prosecutor compared the levels of culpability of Oswald and Jack Ruby. His conclusion was that, although we might accept a mere life sentence for Ruby, Oswald clearly deserved death. JA 800–01. The prosecutor then went on to describe, as a prime example of "vileness," a series of slayings committed by a muslim sect in 1977. Among this group's atrocities were drowning an infant in front of its mother. JA 801.

■ In making these statements, the Commonwealth clearly risked confusing the jury and arousing its prejudices by referring to notorious and grisly crimes not at issue in this case. Such arguments are improper. *See, e.g., McLean v. Commonwealth,* 186 Va. 398, 43 S.E.2d 45 (1947) (prosecutor's improper allusion to unrelated rape-murder in statutory rape case required reversal of conviction). In addition to his religious and other-crime arguments, the Commonwealth made other, less offensive but perhaps confusing statements.[12]

■ Still, the question ultimately is not whether the prosecutor's arguments were improper, but whether Bennett's trial counsel were constitutionally ineffective for failing to object to them. In analyzing counsel's performance under the first, "deficiency" prong of the *Strickland* test, a reviewing court must be "highly deferential" in scrutinizing trial counsels' tactics. 466 U.S. at 689, 104 S.Ct. at 2065. As the Court succinctly put it: "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

The essence of Bennett's argument is that his counsel simply "gave up" by not objecting. *See United States v. Wolf,* 787 F.2d 1094, 1099 (7th Cir.1986) (never objecting is "forensic suicide"). Trial counsel, on the other hand, explain in their affidavits that they intentionally refrained from objecting, not out of despair, but because they did not want to appear overly antagonistic to the jury and wanted to portray themselves as "the good guys." As other courts have noted, refraining from objecting to avoid irritating the jury is a standard trial tactic. *See id.* at 1099; *see also Darden,* 477 U.S. at 183 n. 14, 106 S.Ct. at 2472 n. 14 (1986) (noting that defense counsel made tactical decision not to object to prosecutor's improper closing).

■ Bennett questions the honesty of this explanation, noting that, at the guilt phase, his counsel objected six times to the Commonwealth's closing. Accordingly, Bennett concludes that his counsel's "tactics" are really post-hoc fabrications and, as such, are unworthy of deference. *See Griffin v. Warden,* 970 F.2d 1355, 1359 (4th Cir.1992) ("Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another.") But we draw no such inference from counsels' differing behavior under such different circumstances. What may be proper tactics while the question of guilt is still being decided may not be proper at the sentencing phase, when culpability, not historical fact, is at issue. At sentencing, counsel may very well conclude that their best approach is to avoid appearing contentious.

---

**12.** Bennett objects to the prosecutor's telling the jury that it was running the final leg of a relay race, which had been begun by the police, continued by the prosecution and the court, and that now depended on them to finish it. Bennett claims that this argument improperly suggested to the jury that they did not have ultimate responsibility for his punishment. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (improper to tell capital jury that its decision will not be final because of automatic review by state supreme court). To the contrary, this argument seems to emphasize the heavy burden the jury bears.

Accordingly, we cannot conclude that counsel's failure to object to these arguments rendered them constitutionally ineffective.

### 4.

■ Finally, Bennett argues that his counsel were ineffective for (1) failing to object to the mitigation instruction and jury forms used at his sentencing and (2) failing to sufficiently explain mitigation during their closing argument. These claims are meritless.

We have held that counsel is not ineffective for failing to offer alternatives to proper jury instructions. *Pruett v. Thompson,* 996 F.2d 1560, 1577 (4th Cir.1993). Further, we have approved the capital sentencing jury instructions used in Bennett's case, *Briley v. Bass,* 750 F.2d 1238 (4th Cir.1984); as well as Virginia's capital verdict form, specifically the mitigation text Bennett now contests, *Clozza v. Murray,* 913 F.2d 1092, 1104 (4th Cir.1990). Accordingly, Bennett may not base his ineffectiveness claim on his counsel's failure to object or offer alternatives to these proper instructions or verdict forms.

■ Finally, Bennett's suggestion that his counsel failed him in not further explaining "mitigation" to the jury also fails. In his closing argument at sentencing, Bennett's lawyer reminded the jury of all mitigating evidence and further reminded it that even if it found an aggravating factor beyond a reasonable doubt, it still could decide not to give him the death sentence. JA 803–05. Thus Bennett's lawyer did address the jury regarding mitigation. Because we cannot conclude that counsel was *constitutionally* required to do more than he did, Bennett's final ineffectiveness claim fails.

### IV.

For the reasons stated above, the district court's denial of Bennett's petition for a writ of habeas corpus is hereby

*AFFIRMED.*