**John Marvin BOOTH, et al.**

v.

**STATE OF MARYLAND, et al.**

**Civil No. JFM–96–2766.**

United States District Court,
D. Maryland.

Oct. 3, 1996.

Nevett Steele, Jr., Towson, MD, William B. Purpura, Baltimore, MD, Gary W. Christopher, Federal Public Defender's Office, Baltimore, MD, Charles G. Bernstein, Baltimore, MD, Jerome Howard Nickerson, Jr., Bel Air, MD, Fred Warren Bennett, Catholic University Law School, Washington, DC, for petitioners.

Gwynn X. Kinsey, Jr., Office of the Attorney General, Criminal Appeals Division, Baltimore, MD, for respondents.

## MEMORANDUM

MOTZ, Chief Judge.

Petitioners are five prisoners who have been sentenced to death in the Maryland state courts. They have each previously filed a petition for post-conviction review that has been finally disposed of by the Maryland Court of Appeals. They have instituted this action for declaratory and injunctive relief on the question of whether the "Special Habeas Corpus Procedures in Capital Cases" established by Chapter 154 of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("the 1996 Act") apply to their cases.[1] If Chapter 154 does apply, petitioners must file their federal habeas petitions on or before October 24, 1996, the date 180 days after the effective date of the 1996 Act. *See* 28 U.S.C. § 2263(a).

Petitioners filed a motion for preliminary injunction. A hearing on that motion was held on September 24, 1996. It became apparent during the course of the hearing that in light of two litigation positions being taken by respondents (that this court lacks subject matter jurisdiction over this action and that any preliminary injunction entered by this court would not toll the 180 day requirement of § 2263(a)), petitioners probably will file their federal habeas petitions before October 24, 1996 in any event.[2] Thus, the request for preliminary relief has become somewhat academic. At the same time it became apparent during the course of the hearing that a full

---

1. Petitioners also seek declaratory and injunctive relief on the separate question of whether their Sixth Amendment rights to access to their attorneys and the courts have been violated by a policy of the prisons in which they are incarcerated prohibiting contact visits and requiring them to communicate with their attorneys entirely by telephone or intercom across a plexiglass barrier. The merits of that claim have not yet been briefed or argued by the parties.

2. A concession made by counsel for respondents during the hearing makes it all the more likely that petitioners will file their federal habeas petitions before October 24, 1996. Counsel agreed that if (1) a federal petition is filed prior to October 24, 1996 asserting both exhausted and unexhausted claims, (2) it is ultimately determined that Chapter 154 does not apply and (3) the judge handling the habeas petition dismisses it under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), the newly amended § 2244(b)(1) would not prevent a second federal petition from being filed after the petitioner had returned to state courts to have his unexhausted claims resolved there.

and complete factual record has been developed. Accordingly, it is in the interest of all parties and the orderly administration of justice that I enter a final judgment declaring the rights and legal relations of the parties and (since I find in favor of petitioners) permanently enjoining respondents from asserting that the provisions of Chapter 154 apply to petitioners' anticipated federal habeas petitions. The entry of such a judgment will entitle the parties to immediate appellate review of my rulings.

### I.

As a preliminary matter, respondents argue that this court lacks subject matter jurisdiction over this action. Recognizing, as they must, that 28 U.S.C. §§ 1331 and 1343 clearly confer subject matter jurisdiction, their challenge is based solely upon the Eleventh Amendment. They rely upon the Supreme Court's recent decision in *Seminole Tribe of Florida v. Florida,* — U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which holds that the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), does not apply "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Id.* at ——, 116 S.Ct. at 1132.

Without delving into the intricacies of the law concerning Eleventh Amendment immunity, it seems to me that respondents' argument is fundamentally misdirected. It is clear (and respondents do not contend to the contrary) that State officials may be named as defendants in habeas corpus actions. *See, e.g., Ex Parte Royall,* 117 U.S. 241, 249, 6 S.Ct. 734, 738–39, 29 L.Ed. 868 (1886); *Frank v. Mangum,* 237 U.S. 309, 331, 35 S.Ct. 582, 588–89, 59 L.Ed. 969 (1915); *United States v. Hendricks,* 213 F.2d 922, 926 (3d Cir.1954), *cert. denied,* 348 U.S. 851, 75 S.Ct. 77, 99 L.Ed. 670 (1954). This principle itself appears sufficient to negate respondents' Eleventh Amendment challenge. If not, the doctrine that a State may waive its Eleventh Amendment immunity would seem to do so. ■ Although an implicit or constructive waiver may ordinarily be found "[o]nly when Congress has clearly considered [the waiver issue] and expressly declared that any State which undertakes given regulable conduct will be deemed thereby to have waived its immunity," *Parden v. Terminal Ry. of Ala. Docks Dep't.,* 377 U.S. 184, 198–99, 84 S.Ct. 1207, 1216–17, 12 L.Ed.2d 233 (1964) (White, J., dissenting), *quoted with approval in Welch v. Texas Highways & Pub. Transp. Dep't,* 483 U.S. 468, 477, 107 S.Ct. 2941, 2947–48, 97 L.Ed.2d 389 (1987), implicit waiver cases usually arise in the context where a State would not have been subject to suit in federal court but for its participation in a particular federal program. The situation here is different since, as stated above, State officials have no Eleventh Amendment immunity in federal habeas cases. The question therefore is whether respondents have consented to the form of declaratory and injunctive relief that petitioners seek under 28 U.S.C. § 2201. In my view by announcing their intention to invoke the benefit of Chapter 154 they have done so.

In any event, if the *Ex Parte Young* analysis proffered by respondents is the appropriate one here, this case does not fall within the *Seminole Tribe* constraints upon *Ex Parte Young's* holding. Chapter 154 hardly "prescribe[s] a detailed remedial scheme" for the determination of whether a State is entitled to the Chapter's benefits. —— U.S. at ——, 116 S.Ct. at 1132. The Chapter is silent as to the procedural mechanism by which the adequacy of a State's post-conviction processes may be challenged in court. To the extent that Congressional intent on that question can be gleaned from the statutory provisions, it seems rather clear that it was contemplated that the question of a State's compliance with Chapter 154's requirements would be decided in a proceeding independent of an individual habeas claim. The whole thrust and purpose of Chapter 154 is to expedite litigation of federal habeas proceedings in capital cases. The Chapter not only imposes limitations upon the time that a federal petition can be filed but also imposes time limitations (180 days for district courts, 120 days for courts of appeals) to decide habeas petitions. 28 U.S.C. § 2266. The constitutional issues presented in capital cases are themselves sufficiently complex to

render compliance with these time limitations difficult. It thus seems to me that it would be unreasonable to infer that Congress also intended that within those time limits courts must decide the ancillary questions presented by Chapter 154's adequacy of representation provisions.[3]

## II.

28 U.S.C. § 2261(b) (as amended by the 1996 Act) provides in pertinent part as follows:

> This chapter is applicable if a State establishes by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

Four questions are raised by this statutory language. First, in order to meet the requirements of § 2261(b), must Maryland have adopted a rule of court or a statute that "provide[s] standards of competency for the appointment of such counsel?" Second, if Maryland need not have established such a rule of court or statute, must Maryland's Office of Public Defender (the agency that appoints counsel to represent petitioners) establish such standards of competency?

Third, has the Office of Public Defender done so? Fourth, the issue of competency standards aside, does the mechanism that Maryland has established provide for the "compensation and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings?"[4]

## A.

As to the first question, the parties take diametrically opposed positions. Petitioners contend that under the last sentence of § 2261(b) a State must adopt a "rule of court or statute ... provid[ing] standards of competency for the appointment of ... counsel." According to petitioners, since it is undisputed that Maryland has not adopted any such rule of court or statute, it has not complied with § 2261(b). Respondents, on the other hand, assert that reading the first and last sentences of § 2261(b) together dictates the conclusion that where a State has established an agency (here the Office of Public Defender) that appoints and compensates counsel, no standards of competency for the appointment of counsel are necessary. According to respondents, this is because the first sentence provides three means by which a mechanism for the appointment and compensation of counsel can be established (statute, rule of court or "another agency authorized by State law") and the last sentence indicates that standards of competence must be provided only when one of the first two of these means is employed.

It is unfortunate that a piece of legislation, particularly one of such widespread importance and legitimate public interest, is so

---

**3.** Requiring relitigation of those questions in each habeas case is also inconsistent with the purpose of the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471 *et seq.*, to reduce the cost and delay of civil litigation in the federal courts. In that regard I recognize the responsibility of respondents and their counsel to raise questions concerning this court's subject matter jurisdiction. However, it is clearly not in the interest of any citizen of the State of Maryland to have her state and federal tax dollars wasted by having assistant attorneys general and counsel for capital defendants appointed and compensated under the Criminal Justice Act litigate before multiple judges in successive pieces of litigation issues that can easily be resolved in a consolidated proceeding.

**4.** A fifth question posed by petitioners, whether Maryland has "establishe[d] a mechanism for the appointment and compensation of counsel" within the meaning of § 2261(b) since it has taken no action subsequent to the enactment of the 1996 Act to create such a mechanism, appears to be foreclosed by *Bennett v. Angelone,* 92 F.3d 1336 (4th Cir.1996). There, the Fourth Circuit held that the relevant issue is whether a State has complied with § 2261 at the time of the prisoner's State post-conviction proceedings, not whether there has been "post-enactment" action taken by the State. *Id.* at 1342.

poorly drafted. The confusion is caused by the fact that when an overhaul of habeas procedures in capital cases was first suggested in 1989 by the Ad Hoc Committee on Federal Habeas Corpus in Capital Cases (the Powell Committee), the proposed language did not include reference to an agency-created appointment mechanism; the subchapter was to be applicable only if a state established an appointment mechanism "by rule of its court of last resort or by statute." *See Report on Habeas Corpus in Capital Cases,* 45 Crim.L.Rep. (BNA) 3241 (Sept. 27, 1989). As then written, the subsequent reference to "the rule of court or statute" made sense given the narrower language that preceded it. In 1995, however the phrase "or another agency authorized by State law" was added to the first sentence. Since a "statute" or a "rule of ... [a State's] court of last resort"— the two terms that precede the added language—are not "agencies," the phrase *"another* agency authorized by State law" is nonsensical in context. It is a species of a different genus. Furthermore, no reference to agency promulgated regulations was added to the last sentence. What is one to infer from that fact? Does it mean that the agency must follow standards of competency established by statute or rule of court? Does it mean that an agency can appoint counsel for capital defendants without application of any articulated standards of competency? Or does it simply mean that there was an oversight when section 2261(b) was finally pieced together?

There is no principled way to answer these questions. The statutory language can be "plainly read" either way, and neither side's interpretation is entirely satisfactory. To adopt petitioners' interpretation would to some extent be to diminish the efficacy of the "authorized agency" alternative afforded by § 2261(b) since the State would have to enact a statute or court rule as well as establishing an authorized agency. Conversely, respondents' interpretation would mean either that an agency's practices in determining who is competent to represent death row defendants in post-conviction proceedings are unreviewable in federal court or that in each and every capital habeas case a federal judge must consider the effectiveness of the representation provided by State post-conviction counsel (perhaps not only in the case before her but in prior cases as well).

■ In my view petitioners have the better of the argument and if forced to choose between the parties' conflicting interpretations, I would select petitioners'. However, it seems to me that Congress may well have had in mind another variant: that if a State establishes an agency to appoint and compensate counsel, that agency itself is to establish standards of competency that it would itself follow. This interpretation provides an overarching concept that brings sense to the first sentence of § 2261(b). If what was contemplated was regulatory standards written by an authorized agency, the missing element in the first sentence is supplied: regulations are of the same generic kind as statutes and rules of court. I recognize, of course, that the third sentence does not contain any reference to "rules promulgated by the authorized agency." However, given the history and the intent of the legislation it is not unreasonable to infer that Congress intended such regulations to be encompassed within the terms "statute" or "rule of court." While this may do some violence to the principle of strict construction, it is the gentle violence of reason.

### B.

■ If petitioners' interpretation of § 2261(b) is correct, petitioners prevail since it is undisputed that the Maryland General Assembly has not enacted a statute and the Maryland Court of Appeals has not adopted a rule of court setting competency standards. Petitioners likewise prevail if the interpretation of § 2261(b) which I have suggested is the appropriate one, since the record is undisputed that Maryland's Office of Public Defender has not established any competency standards in capital post-conviction cases. Although respondents initially took the position that a regulation issued by the Office of Public Defender (set forth in the Maryland Code of Regulations, COMAR 14.06.02.05.-B(1)) requires that attorneys appointed in capital post-conviction proceedings must have "previously participated in a circuit court in

at least two capital cases or ten other cases where the maximum penalty was 10 years imprisonment or more," the evidence produced at the September 24th hearing conclusively proved that the Office of Public Defender did not apply that regulation in post-conviction proceedings. Respondents have suggested no other objective standards that the Office of the Public Defender has applied.

### III.

I also find that the State has failed to "establish a mechanism for the ... compensation and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings" as required by the first sentence of § 2261(b). The undisputed evidence at the September 24th hearing establishes the following limitations that the Office of Public Defender imposes when appointing and compensating counsel in State post-conviction proceedings in capital cases:

Number of lawyers—2

Hourly rates

Out of court—$30 per hour

In-court work—$35 per hour

Caps on fees

First proceeding

through trial court—$12,500 (per attorney)

on appeal through Maryland Court of Appeals and *certiorari* petition to Supreme Court—$6,250 (to be split between attorneys)

on appeal through Supreme Court if *certiorari* granted—$6,250 (to be split between attorneys)

Second post-conviction proceeding

(through trial and appeal)—$12,500 (to be split between attorneys)

Expenses

Computerized research—0

Photocopying—0

Petitioners also presented evidence that the law firm of a lawyer who has been appointed to represent one of the petitioners in State post-conviction proceedings has recently conducted a study, unrelated to this law suit, which demonstrates that the firm's annual overhead—excluding any income for lawyers—is $106,000 per attorney. Assuming that an attorney works 2,000 billable hours per year, this means that the rate necessary simply to pay overhead (before any lawyer compensation) is $53 per hour.[5]

The same lawyer also presented an analysis of the effective hourly rate that he had been paid for representing his client in state post-conviction proceedings. His compensation was $12,500 and he had been reimbursed expenses in the amount of $3,212.99. However, the total expenses that he had incurred were $6,839.29, leaving an unpaid balance of $3,626.30. Therefore, the net income to his firm was $12,500 minus $3,626.30 or $8,873.70. He and other lawyers in his firm have thus far spent 756.5 hours in representing his client. Therefore, his effective hourly rate has been $11.73.

On this record it cannot be fairly concluded that the State's mechanism for compensating lawyers appointed to represent capital defendants in State post-conviction proceedings and to reimburse them for their expenses is reasonable.[6] Respondents have not suggested that the lawyer in question and his associates have spent an unreasonable number of hours in representing their client. Nor have they challenged the figures that he has pre-

---

**5.** Petitioners also presented as a witness a representative of the Federal Public Defender's Office who is responsible for budgeting and financial matters in that office. He had performed a similar study and determined that, excluding attorney income, the overhead of the Federal Public Defender's Office for fiscal year 1996 per each trial attorney was remarkably similar—$102,948.

**6.** I note that although § 2261(b) does not expressly require that a State establish a mechanism for the payment of reasonable compensation, it does require the payment of "reasonable

litigation expenses." Therefore, arguably, *reasonable* compensation is not required. Commendably, respondents have not made any such argument. If they were to do so, it would be unavailing. Petitioners have also presented evidence of the extreme difficulty that the Office of Public Defender has encountered in finding counsel to represent capital defendants in State post-conviction proceedings. Clearly, the payment of at least minimally reasonable compensation is necessary to obtain competent counsel, an express requirement of § 2261(b).

sented. Obviously, it is not reasonable to compensate a lawyer for representing capital defendants in state post-conviction proceedings at a rate $41 less than the rate necessary for him to pay his share of his firm's overhead. In that regard, I take judicial notice of the fact that under the Federal Criminal Justice Act attorneys appointed to represent capital defendants in federal habeas corpus actions may be paid up to $125 per hour and fee awards in six figures are not uncommon.[7] Furthermore, it is obviously unreasonable not to reimburse a lawyer anything at all for photocopying expenses or (at least in light of the meager hourly rate and cap on attorney compensation) for computerized legal research.

A separate order is being entered herewith declaring that Maryland is not presently entitled to invoke the benefits of Chapter 154 of the 1996 Act and enjoining respondents from contending to the contrary in the federal habeas petitions filed or to be filed by petitioners.

### ORDER

For the reasons stated in the memorandum entered herewith, it is, this 3rd day of October, 1996

ORDERED

1. Defendants' motion to dismiss is denied;

2. It is declared and adjudged that the State of Maryland is not presently entitled to invoke the benefits of Chapter 154 of the Anti–Terrorism and Death Penalty Act of 1996 because it has not met the requirements of 28 U.S.C. § 2261(b) as amended by the Act; and

3. Respondents are enjoined from asserting in any federal habeas proceedings filed or to be filed by each of the petitioners that the

State of Maryland is entitled to the benefits of Chapter 154.

---

7. In support of their contention that the State's compensation structure is adequate, respondents point to the facts that (1) the Fourth Circuit reduced from 220 hours to 75 hours the amount of time spent working on an appeal by an attorney appointed to represent a capital defendant in a federal habeas case, and (2) a $5,000 cap is imposed by the Supreme Court in capital habeas cases. These figures, without any surrounding context, are meaningless. If anything, they demonstrate the inadequacy of the State's compensation structure. The hourly rate paid to the attorney in the Fourth Circuit case was $110; thus the total fee awarded by the Fourth Circuit was over $7,500. It is one thing to apply such a cap (as well as the similar $5,000 cap imposed by the Supreme Court) for the last stages of a habeas proceeding after much prior work has been done. It is quite another to impose a $12,500 cap (based upon an hourly rate of $30) at the earlier stages of habeas proceedings.