**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WESLEY EUGENE BAKER,
Petitioner-Appellant,

v.

THOMAS R. CORCORAN, Warden of

the Maryland Correctional
Adjustment Center; J. JOSEPH
CURRAN, JR., Attorney General of
the State of Maryland,
Respondents-Appellees.

No. 99-24

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-97-850-WMN)

Argued: April 5, 2000

Decided: July 19, 2000

Before WILKINSON, Chief Judge, and WILKINS
and WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkins wrote the opinion, in
which Chief Judge Wilkinson and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Gary Wilmer Christopher, Chief Assistant Federal Public
Defender, Baltimore, Maryland, for Appellant. Ann Norman Bosse,

Assistant Attorney General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland; William B. Purpura, Baltimore, Maryland, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees.

_____

## OPINION

WILKINS, Circuit Judge:

Wesley Eugene Baker appeals an order of the district court denying his petition for a writ of habeas corpus,[1] in which he challenged his convictions and death sentence for the murder of Jane Tyson. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 2000). [2] The State cross-appeals an order of the district court denying its motion to dismiss Baker's petition as untimely under 28 U.S.C.A. § 2263 (West Supp. 2000), maintaining that the district court incorrectly ruled that Maryland has not satisfied the "opt-in" requirements of 28 U.S.C.A. § 2261(b), (c) (West Supp. 2000). We conclude that Maryland has not satisfied the opt-in requirements and that Baker is not entitled to habeas relief. Accordingly, we affirm.

_____

[1] Baker named Eugene Nuth, Warden of the Maryland Correctional Adjustment Center where Baker is incarcerated, and Attorney General J. Joseph Curran, Jr. as Respondents. Nuth has since been replaced by Thomas R. Corcoran. For ease of reference, we refer to Respondents as "the State" throughout this opinion.

[2] Because Baker's petition for a writ of habeas corpus was filed after the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, the amendments to 28 U.S.C.A. § 2254 effected by§ 104 of the AEDPA govern the resolution of this appeal. See Slack v. McDaniel, 120 S. Ct. 1595, 1602 (2000).

2

I.

On the evening of June 6, 1991, Tyson went to the Westview Mall near Baltimore, Maryland with her grandchildren, six-year-old Adam and four-year-old Carly. Tyson was shot as the three were entering Tyson's maroon Buick to return home. At the time of the shooting, Carly had entered the back seat, Adam was preparing to enter the front passenger seat, and Tyson was preparing to enter the driver's seat. Adam saw a man run up to Tyson, heard her scream, and saw the man shoot her in the head. The man then entered "the left side" of a blue "truck" and drove away. J.A. 30 (internal quotation marks omitted).[3]

Scott Faust happened upon the scene within seconds of the shooting. He observed a blue Chevy Blazer facing west and a maroon Buick facing east. The two vehicles were parallel to each other and separated by a distance of approximately ten feet. Faust observed two men run from the vicinity of the Buick and enter the Blazer. The passenger, whom Faust subsequently identified as Baker, was wearing a dark t-shirt and a baseball hat; the driver, subsequently identified as Gregory Lawrence, was wearing a bright orange t-shirt. Faust then saw Tyson lying near the driver's side door of the Buick. Faust followed the Blazer out of the mall parking lot, eventually getting close enough to record the license plate number and to observe Lawrence and Baker. He then returned to the mall and provided this information to the police.

Shortly thereafter, Baltimore County police officers spotted the Blazer and gave chase. The Blazer stopped abruptly and a passenger, who was dressed in dark clothing, fled on foot. The officers stopped the Blazer a short distance away and arrested the driver, Gregory Lawrence. Baker was arrested a short time later, and at that time officers observed what appeared to be blood on his shoe, sock, and leg. Subsequent testing revealed that the blood was Tyson's. Officers found Tyson's purse, wallet, and photograph holder on the path of Baker's flight. Other items belonging to Tyson were found in the

_____

[3] A subsequent autopsy revealed that Tyson was killed by a single gunshot wound to the head; forensic evidence indicated that the weapon was in contact with Tyson's temple at the time of the shooting.

Blazer, as was the firearm that had been used to shoot her. Additionally, fingerprints from Baker's right hand were found on the driver's side door and window of the Buick.

Baker was charged with first degree premeditated murder, first degree felony murder, robbery with a deadly weapon, and use of a handgun during the commission of a felony. Trial counsel elected to concede Baker's involvement in the offenses in favor of arguing that Baker was not a principal in the first degree, i.e., he did not shoot Tyson. At counsel's request, the jury was instructed to return a special verdict indicating whether the State had proven beyond a reasonable doubt that Baker was a principal in the first degree; a "no" response would have rendered Baker ineligible for the death penalty. See Md. Ann. Code art. 27, § 413(e)(1)(i) (Supp. 1999); Gary v. State, 671 A.2d 495, 498 (Md. 1996). The jury subsequently convicted Baker of the charged offenses and found that he was a principal in the first degree.

Baker chose to be sentenced by the court rather than by the jury. During his case in mitigation, Baker presented the testimony of Dr. Robert Johnson, who stated that Baker was unlikely to be a danger to other inmates if sentenced to life imprisonment. Defense counsel then informed the court that they had intended to call two additional witnesses--Baker's mother, Dolores Williams, and social worker Lori James--to testify regarding Baker's family history, but that Baker had directed counsel not to call those witnesses "because there were going to be very painful kinds of things testified about." J.A. 199. Counsel further stated that "we have to respect--man to man--Mr. Baker's very clear, unequivocable [sic] and express directions to us." Id. A lengthy discussion followed, during which the court considered calling Williams and James as court witnesses but decided not to do so after Baker informed the court that he did not want the evidence introduced because he thought it would be damaging and for "personal reasons." Id. at 209.

After hearing argument from the parties, the court sentenced Baker to death. The court first independently determined that the State had proven beyond a reasonable doubt that Baker was a principal in the first degree. The court then found that the State had established one aggravating circumstance--that the murder was committed in the

4

course of a robbery, see Md. Ann. Code art. 27, § 413(d)(10) (Supp. 1999). The court found no mitigating circumstances, explicitly rejecting Dr. Johnson's testimony that Baker was unlikely to pose a danger to others if sentenced to life imprisonment. Additionally, the court noted that even if it had considered Dr. Johnson's testimony as establishing a mitigating circumstance, it would have found that the mitigating circumstance was outweighed by the aggravating circumstance.

Shortly thereafter, Baker moved for reconsideration of his sentence, stating that he had "reflected upon his decision not to call [Williams and James] on his behalf and realize[d] that he made a serious error in judgment." J.A. 245. Baker also requested that the court consider testimony from his brother and son. The court granted the motion, and defense counsel presented testimony from James.[4] James testified that Baker was raised in a dysfunctional family that consisted of Baker's mother, his stepfather, and his siblings. James testified that Baker was the product of the rape of his mother, a fact of which he was unaware until the sentencing phase of his trial. [5] She further stated that although Baker was never physically abused, [6] he observed his stepfather beating his mother. James also found that Baker's family had poor communication patterns and that several family members abused drugs. The court considered this information and found that it was not mitigating, and therefore elected not to reduce Baker's sentence.

Baker then appealed his convictions and sentence to the Maryland Court of Appeals. Among other things, Baker argued that the trial

_____

[4] Baker's mother was not present for the proceeding due to a miscommunication; the record does not reveal why Baker's brother and son did not testify.

[5] Counsel did not assert that Baker's origins constituted a mitigating circumstance; rather, the information was offered as an explanation of why Baker refused to present James' and Williams' testimony at the initial sentencing hearing. Additionally, James asserted that Baker's lack of knowledge about the rape of his mother was indicative of a pattern of keeping secrets that was part of the dysfunctionality of the family.

[6] James uncovered one instance of sexual abuse, in which Baker was molested by two teenage girls when he was less than five years old.

5

court had improperly instructed the jury that premeditation could be inferred from the "intensity and effect" of a wound, asserting that such an instruction had "no basis in Maryland law." Id. at 310-11 (internal quotation marks omitted). The Maryland Court of Appeals affirmed, and the United States Supreme Court denied certiorari. See Baker v. State, 632 A.2d 783 (Md. 1993), cert. denied, 511 U.S. 1078 (1994).

Baker filed a petition for post-conviction relief (PCR) in December 1994. As is relevant here, Baker maintained that trial counsel were constitutionally ineffective for failing to conduct any independent investigation of the case; for conceding Baker's principalship during closing argument; and for failing to present testimony from Williams and James at the initial sentencing hearing. Following a hearing, the PCR court denied relief. The Maryland Court of Appeals denied Baker's application for leave to appeal, and the United States Supreme Court denied certiorari, see Baker v. Maryland, 517 U.S. 1169 (1996).

The United States District Court for the District of Maryland subsequently appointed federal habeas counsel for Baker. In October 1996, Baker moved through counsel to reopen the state PCR proceedings, asserting that certain claims had not been presented in his initial PCR proceeding due to post-conviction counsel's incompetence. The motion to reopen and a subsequent addendum included the following claims: that the trial court issued an unconstitutional instruction regarding the meaning of "reasonable doubt"; that trial and appellate counsel were constitutionally ineffective for failing to object to the reasonable doubt instruction and to challenge it on appeal; that trial counsel's failure to conduct an investigation resulted in the failure to discover evidence indicating the existence of a third participant in the crime; that trial counsel were ineffective for failing to obtain an expert examination of the murder weapon; and that trial counsel failed to investigate Gregory Lawrence. Following a non-evidentiary hearing, the state court denied the motion to reopen in a letter ruling. The Maryland Court of Appeals subsequently denied Baker's application for leave to appeal. See Baker v. State, 690 A.2d 1008 (Md. 1997).

On March 21, 1997, Baker filed his federal petition for a writ of habeas corpus. The State moved to dismiss the petition, arguing that

6

Maryland had satisfied the "opt-in" requirements of 28 U.S.C.A. § 2261(b), (c) and that Baker's petition was untimely under the 180-day limitations period applicable to habeas petitions filed by prisoners subject to capital sentences in opt-in states, see 28 U.S.C.A. § 2263. The district court conducted a hearing on the motion to dismiss during which it heard testimony from several witnesses; additionally, the court adopted the factual records produced in two other cases involving the question of whether Maryland had satisfied the opt-in requirements of § 2261(b), (c). See Colvin-El v. Nuth, No. Civ. A. AW 97-2520, 1998 WL 386403 (D. Md. July 6, 1998); Booth v. Maryland, 940 F. Supp. 849 (D. Md. 1996), vacated on other grounds, 112 F.3d 139 (4th Cir. 1997). Following the hearing, the district court concluded that Maryland had not satisfied the opt-in requirements for the reasons set forth in Booth and Colvin-El . See Colvin-El, 1998 WL 386403, at *2-*8; Booth, 940 F. Supp. at 852-55. The court therefore denied the motion to dismiss. The district court subsequently denied habeas relief, but granted Baker a certificate of appealability, see 28 U.S.C.A. § 2253(c) (West Supp. 2000), as to all issues raised on appeal.

We first address the State's contention on cross-appeal that Maryland has satisfied the opt-in requirements of 28 U.S.C.A. § 2261(b), (c) and thus is entitled to application of the 180-day limitations period set forth in 28 U.S.C.A. § 2263. Because we conclude that Maryland is not an opt-in state, we then proceed to consider the issues raised by Baker on appeal.

II.

In addition to amending Chapter 153 of Title 28, the AEDPA added a new chapter 154, codified at 28 U.S.C.A.§§ 2261-2266 (West Supp. 2000), which applies to habeas petitions filed by state prisoners subject to capital sentences. See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132,§ 107, 110 Stat. 1214, 1221-26. Chapter 154 provides more stringent limitations on habeas petitions in capital cases than are applicable in non-capital habeas proceedings; however, in order to take advantage of these limitations, a state must first "opt in" by satisfying the requirements of § 2261(b), (c). Specifically, a state must"establish[ ] by statute, rule of its court of last resort, or by another agency authorized by State

7

law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings." 28 U.S.C.A. § 2261(b). The mechanism "must provide standards of competency" for state post-conviction counsel, id., and "must provide for the entry of an order by a court of record" appointing counsel, finding that the petitioner knowingly refused counsel, or denying counsel upon a finding that the petitioner is not indigent, id. § 2261(c).[7] As this court has previously noted, Chapter 154 "establishes a quid-pro-quo relationship: A state seeking greater federal deference to its habeas decisions in capital cases must, by appointing competent counsel to represent indigent petitioners, further ensure that its own habeas proceedings are meaningful." Bennett v. Angelone, 92 F.3d 1336, 1342 (4th Cir. 1996).

_____

[7] Section 2261(b), (c) provides in full:

> (b) [Chapter 154] is applicable if a State establishes by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

> (c) Any mechanism for the appointment, compensation, and reimbursement of counsel as provided in subsection (b) must offer counsel to all State prisoners under capital sentence and must provide for the entry of an order by a court of record--

> (1) appointing one or more counsels to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

> (2) finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

> (3) denying the appointment of counsel upon a finding that the prisoner is not indigent.

Under Maryland law, the Office of the Public Defender (OPD) is the state agency responsible for providing legal representation to indigent prisoners in post-conviction proceedings. See Md. Ann. Code art. 27A, § 4(b)(3) (1997). While representation in state post-conviction proceedings may be provided by an OPD attorney or by a private "panel" attorney, see Md. Ann. Code art. 27A, § 6 (1997), as a matter of practice state habeas petitioners are almost always represented by panel attorneys in order to avoid conflicts of interest with respect to assertions that an OPD attorney provided ineffective representation at trial or on direct appeal. Pursuant to its statutory authority, the OPD has promulgated a regulation setting forth a minimum standard of competency for panel attorneys in capital litigation:

> Panel A shall be comprised of licensed attorneys whose members are qualified to provide legal representation for an accused charged with a capital offense. To qualify for designation on this panel, an attorney shall have previously participated in a circuit court in at least two capital cases or ten other cases where the maximum penalty was 10 years imprisonment or more.

Md. Regs. Code tit. 14, § 06.02.05(B)(1) (1986).

As a matter of policy, but apparently not by regulation, the OPD has adopted a compensation schedule for panel attorneys in post-conviction proceedings. For proceedings in the PCR court, such attorneys are paid $30 per hour for out-of-court time and $35 per hour for in-court time, subject to a cap of $12,500 for each attorney. The OPD arranges and pays for expert witnesses and investigators and reimburses attorneys for various expenses, including travel and long-distance telephone calls. However, research expenses, including electronic research and law clerk time, are counted toward the $12,500 cap. On appeal, panel attorneys divide a total fee of $6,250, which may be increased to $12,500 if the Maryland Court of Appeals grants a petition for a writ of certiorari.

In adopting the reasoning of Booth and Colvin-El, the district court ruled that the Maryland mechanism for the appointment and compensation of post-conviction counsel in capital cases fails to satisfy the opt-in requirements in three ways: Maryland does not adequately

9

compensate post-conviction counsel; the competency standard set forth in Md. Regs. Code tit. 14, § 06.02.05(B)(1) is inadequate and in any event is not applied to appointed counsel; and the mechanism does not provide for an order of a court of record regarding the appointment, refusal, or denial of counsel. The State argues that all of these conclusions are erroneous.

A.

We first consider the State's contention that it provides adequate compensation for post-conviction counsel. In Booth, the district court found that the per-attorney overhead cost for the firm of an attorney appointed to represent a prisoner in post-conviction proceedings was $53 per hour. See Booth, 940 F. Supp. at 854. Thus, the hourly rates paid to panel attorneys in post-conviction proceedings necessarily resulted in a loss of at least $18 per hour. The loss suffered by a panel attorney's firm will increase when, as is frequently the case, the fee cap limits the number of hours for which the attorney is compensated and/or the expenses for which the attorney is reimbursed. For example, the Booth court noted that in one case, a panel attorney had been compensated at an effective rate of $11.73 per hour after subtracting unreimbursed expenses from the $12,500 fee cap; the result was a loss for the attorney's firm of approximately $41 per hour. See id. at 854-55. Similarly, in this case the Chief of the Capital Defense Division of the OPD testified that a panel attorney in one capital post-conviction proceeding had been compensated at an effective rate of $13 per hour. In contrast, the Booth court took judicial notice of the fact that "under the Federal Criminal Justice Act attorneys appointed to represent capital defendants in federal habeas corpus actions may be paid up to $125 per hour and fee awards in six figures are not uncommon." Id. at 855.

In light of these findings, we cannot conclude that Maryland adequately compensates state post-conviction counsel. A compensation system that results in substantial losses to the appointed attorney or his firm simply cannot be deemed adequate.**8**

_____

**8** The State's reliance on Mata v. Johnson, 99 F.3d 1261 (5th Cir. 1996), vacated in part on other grounds on reh'g, 105 F.3d 209 (5th Cir.

10

B.

The State next maintains that the district court erred in concluding that Maryland has not "provide[d] standards of competency for the appointment of" state post-conviction counsel. 28 U.S.C.A. § 2261(b). As noted above, a Maryland regulation requires that panel attorneys appointed to serve as post-conviction counsel in capital cases have participated in at least two previous capital cases or ten criminal cases in which the maximum penalty was at least ten years imprisonment. However, the evidence before the district court established that the OPD does not actually apply this standard in appointing post-conviction counsel in capital cases. See Colvin-El, 1998 WL 386403, at *5 ("The evidence . . . indicated that the system in place in Maryland is little more than an ad hoc, catch-as-catch-can system where members of the OPD seek out people that they believe to be well known in the legal community and attempt to enlist them in post-conviction representation." (internal quotation marks omitted)). Indeed, the Chief of the Capital Defense Division testified below that he was not even aware of the regulation until the commencement of the Booth litigation. We agree with the district court that a state does not "provide standards of competency" simply by identifying criteria for the appointment of counsel. Competency standards are meaningless unless they are actually applied in the appointment process.**9** See

_____

1997), is misplaced. In Mata, the Fifth Circuit held that a fee cap of $7,500 for state post-conviction proceedings was not"facially inadequate." Mata, 99 F.3d at 1266. Here, unlike in Mata, there is substantial evidence regarding the actual inadequacy of the compensation rates. Cf. id. (noting that petitioner had not offered any evidence regarding the actual inadequacy of the $7,500 cap).

Additionally, we reject the State's argument that the compensation requirement is necessarily satisfied whenever competent counsel is appointed. Assuming that Maryland appoints competent counsel in capital post-conviction proceedings, this fact is utterly irrelevant to whether those attorneys are adequately paid for their time. That Maryland has thus far been able to locate counsel willing to shoulder the financial burden of appointment in such cases simply does not establish that it is in compliance with § 2261(b).

**9** In light of this conclusion, we need not consider whether Maryland's competency standards, if complied with, are adequate to ensure that pris-

11

Ashmus v. Woodford, 202 F.3d 1160, 1168 (9th Cir. 2000) (concluding that "a state's competency standards must be mandatory and binding if the State is to avail itself of Chapter 154"), petition for cert. filed, 68 U.S.L.W. 3686 (U.S. Apr. 25, 2000) (No. 99-1720); Mata v. Johnson, 99 F.3d 1261, 1267 (5th Cir. 1996) (stating that competency standards must be "specific" and "mandatory" in order to satisfy the opt-in requirements), vacated in part on other grounds on reh'g, 105 F.3d 209 (5th Cir. 1997).

The State does not seriously challenge this conclusion, but rather argues that it is not required to promulgate competency standards in order to satisfy the opt-in requirements. The State notes that 28 U.S.C.A. § 2261(b) provides that a mechanism for the appointment and compensation of post-conviction counsel may be established "by statute, rule of [the] court of last resort, or by another agency authorized by State law," but identifies only "[t]he rule of court or statute" as potential sources for competency standards. The State would have us interpret this difference in language as indicating that no competency standards are required when a state employs a state agency, rather than a statute or rule of court, to establish a mechanism for the appointment and compensation of counsel.

This argument borders on the absurd. Section 2261(b) plainly and unequivocally contemplates that a state will promulgate competency standards as part of the "quid pro quo" established in Chapter 154. To suggest that a state could avoid the requirement of ensuring the competency of state post-conviction counsel by the mere expedient of employing a state agency to establish the required mechanism for appointing and compensating counsel is to flout both the language and the evident purpose of the statute. In our view, the proper question is not whether competency standards must be promulgated when a mechanism for the appointment of counsel is established through a

_____

oners subject to capital sentences receive competent representation in post-conviction proceedings. But cf. Colvin-El , 1998 WL 386403, at *6 (concluding that the Maryland competency standards are not adequate because they do not require trial experience in serious criminal matters, do not require any experience in "the extraordinarily complex body of law and procedure unique to post-conviction review," and apparently do not apply to OPD attorneys).

12

state agency. Rather, the question is whether a state that employs a state agency to establish a mechanism for the appointment and compensation of post-conviction counsel may also promulgate competency standards through that agency, or whether such a state must nevertheless promulgate competency standards through a rule of court or statute. For the reasons stated in Booth, 940 F. Supp. at 853, we conclude that when a state agency establishes a mechanism for the appointment and compensation of post-conviction counsel, that agency may also promulgate the required standards of competency for such attorneys.

C.

Finally, the State argues cursorily that it has done all that is necessary to comply with § 2261(c), which requires that any mechanism for the appointment and compensation of state post-conviction counsel "must provide for the entry of an order by a court of record" appointing counsel, finding that the petitioner has rejected the offer of counsel, or finding that the petitioner is not indigent and thus not entitled to counsel. Although the OPD has promulgated no regulation that complies with § 2261(c), the State maintains that compliance with the literal terms of § 2261(c) is unnecessary because the appointment of counsel is assured through other means and because"[n]o capital defendant in Maryland has ever litigated a post conviction proceeding without counsel." Brief of Appellees at 65.

To reject this argument, we need look no further than the plain language of § 2261(c), which by its terms requires that a mechanism for the appointment and compensation of state post-conviction counsel provide for the entry of an order regarding the appointment, refusal, or denial of counsel. At present, no provision of Maryland law comports with this requirement. Accordingly, the State's argument that it has complied with this portion of the opt-in requirements is without merit.

III.

Having concluded that Baker's petition is not time-barred, we now turn to the issues raised by him on appeal. Before considering the merits of Baker's claims, however, we first must address the State's

13

argument that several of Baker's claims are defaulted. The State contends (1) that Baker's due process challenge to the premeditation instruction given by the trial court is defaulted because it was never presented to the state courts, and (2) that Baker's challenge to the reasonable doubt instruction, and the other claims raised in the motion to reopen the PCR proceeding, were not properly presented to the state courts. We agree with the State that Baker's claim regarding the premeditation instruction is defaulted. However, we reject the State's assertion that the claims presented for the first time in the motion to reopen were not properly exhausted.

The Supreme Court has long recognized that principles of comity dictate that the state be given the first opportunity to correct constitutional errors in criminal proceedings. See Ex parte Royall, 117 U.S. 241, 251-53 (1886). Accordingly, a federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court. See 28 U.S.C.A. § 2254(b)(1); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). The petitioner's duty to exhaust is codified in 28 U.S.C.A. § 2254(c), which provides that "[a]n applicant shall not be deemed to have exhausted [state remedies] . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." However, the Court has never strictly construed the requirement that a claim be raised "by any available procedure"; for example, the Court has held that the exhaustion requirement does not demand that a petitioner raise on collateral review a claim that has been fully considered by the state court on direct review. See Brown v. Allen, 344 U.S. 443, 447 (1953). Rather, the exhaustion requirement is satisfied so long as a claim has been "fairly presented" to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971).

A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court. See Gray v. Netherland, 518 U.S. 152, 161 (1996). "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus

14

review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." Id. at 162.

A.

We first consider the State's assertion that Baker failed to exhaust his federal due process challenge to the premeditation instruction given by the trial court. That instruction was as follows:

> Premeditated means that the Defendant thought about the killing and that there was time, even if brief, for the Defendant to form the intent to kill. The premeditated intent to kill must be formed before the killing.

> Premeditation requires proof that the conscious and deliberate intention to do the fatal act existed for an appreciable time before the act was done. The law does not require that the intention to kill exist for any considerable length of time before the fatal act was done; it is sufficient if there is time for the mind to think and consider the act and then determine to do it.

> The intensity and effect of a wound may provide adequate evidence of a premeditated and determined effort, not simply to harm, but to destroy any semblance of life remaining in Jane Tyson. If the killing stems from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.

J.A. 132-33 (emphasis added). Baker maintains that the emphasized portion of the instruction violated the Due Process Clause because there is no rational connection between the "intensity and effect" of a wound and the element of premeditation. See County Court v. Allen, 442 U.S. 140, 157 (1979) (explaining that a permissive inference violates the Due Process Clause "only if, under the facts of the case, there is no rational way the trier [of fact] could make the connection permitted by the inference"). The State contends that this claim is unexhausted because Baker has never presented it to the state court.

15

Although a petitioner need not "cit[e] book and verse on the federal constitution" in order to satisfy the exhaustion requirement, Picard, 404 U.S. at 278 (internal quotation marks omitted), the federal claim nevertheless must be "fairly presented" to the state court, id. at 275. Fair presentation mandates that the federal claim "be presented face-up and squarely . . . . Oblique references which hint that a theory may be lurking in the woodwork will not suffice." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) (internal quotation marks omitted). Rather, "both the operative facts and the controlling legal principles must be presented to the state court." Id. (internal quotation marks omitted). Importantly, the presentation to the state court of a state law claim that is similar to a federal claim does not exhaust the federal claim. See Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam).

Here, while Baker challenged the "intensity and effect" portion of the premeditation instruction on direct appeal to the Maryland Court of Appeals, he did not assert that the instruction violated the federal Constitution, but rather maintained only that the instruction had "no basis in Maryland law." J.A. 311. Baker acknowledges this deficiency, but asserts that the exhaustion requirement was satisfied because "the constitutional implications" of his challenge to the premeditation instruction were "readily apparent." Appellant's Reply Brief at 27. This argument is flatly inconsistent with the principles of the exhaustion requirement outlined above, and we need not consider it further.

Additionally, Baker relies on West v. Wright, 931 F.2d 262 (4th Cir. 1991), rev'd on other grounds, 505 U.S. 277 (1992), in which we held that "[a]ny challenge to the sufficiency of the evidence to convict in a state prosecution is necessarily a due process challenge to the conviction." West, 931 F.2d at 266. West is inapplicable, however. In West, a panel of this court determined that the petitioner's claim, which was nominally a challenge to a permissive inference, was actually a challenge to the sufficiency of the evidence. See id. at 265 ("[West] raises no challenge to the jury instructions as such. Throughout, his challenge has been to the sufficiency of the evidence to take the case to the jury under any jury instructions." (emphasis added)). Here, in contrast, Baker's challenge is solely directed to the constitutionality of the permissive inference itself. Accordingly, we conclude

16

that Baker has not fairly presented this claim to the state court and thus that it is not exhausted.

We may treat Baker's claim as exhausted--and consequently procedurally defaulted--if he would now be procedurally barred from presenting the claim in state court. In order to address this question, we must first briefly discuss principles of waiver under Maryland law.

Maryland employs a two-tier waiver rule that is part statutory and part common law. The statutory waiver provision, codified at Md. Ann. Code art. 27, § 645A(c)(1) (Supp. 1999), provides that allegations of error are waived "when a petitioner could have made, but intelligently and knowingly failed to make" the allegation in a prior proceeding.**10** Although this statutory language appears to require that every allegation of error be subject to a formal waiver, the Maryland Court of Appeals has construed the provision much more narrowly. See generally Curtis v. State, 395 A.2d 464, 469-74 (Md. 1978) (discussing scope of § 645A(c)(1)). As construed in Curtis, the § 645A(c)(1) requirement of an intelligent and knowing waiver applies only to claims involving fundamental constitutional rights of the type for which the United States Supreme Court has required an express, knowing, and intelligent waiver. See McElroy v. State, 617 A.2d 1068, 1070 (Md. 1993). "As to lesser or non-fundamental rights, the petitioner will be deemed to have waived any claim of error if petitioner or petitioner's counsel failed to exercise a prior opportunity to raise it notwithstanding a lack of personal knowledge of the right of which petitioner was deprived . . . ." Id. Waiver of either type may be excused by special circumstances. See Md. Ann. Code art. 27, § 645A(c)(1); McElroy, 617 A.2d at 1070-71.

Under Maryland law, Baker's challenge to the premeditation instruction does not involve a fundamental right; accordingly, his failure to raise this claim on direct appeal results in a waiver of the claim absent a showing of special circumstances.**11** See Walker v. State, 684

_____

**10** The failure to raise an available claim is presumed to be intelligent and knowing; this presumption may be rebutted, however. See Md. Ann. Code art. 27, § 645A(c)(2) (Supp. 1999).
**11** Baker contends that because the Maryland waiver rule is not consistently applied in capital cases, it cannot serve as an adequate state law

17

A.2d 429, 436-37 (Md. 1996). There having been no such showing here, the claim is defaulted.**12**

B.

In his motion to reopen the state PCR proceedings, Baker raised a challenge to the reasonable doubt instruction given by the trial court and several issues regarding the performance of trial and appellate counsel. Relying on Castille v. Peoples, 489 U.S. 346 (1989), the State contends that because the decision whether to reopen a PCR proceeding rests within the discretion of the PCR court, Baker's motion to reopen did not "fairly present" any claims to the state court. Therefore, the State would have us conclude that these claims are unexhausted. The State further argues that because the claims would be procedurally barred if presented to the Maryland courts at this juncture, they are defaulted.**13**

_____

ground of decision. See Johnson v. Mississippi , 486 U.S. 578, 587 (1988) (explaining that a state law rule is adequate if it is "consistently or regularly applied" by the state court). A panel of this court recently rejected a challenge to the adequacy of the Maryland rules of waiver, see Oken v. Corcoran, No. 99-27, slip op. at 6 (4th Cir. July 18, 2000), and we have no authority to reconsider that conclusion here, see Etheridge v. Norfolk & W. Ry. Co., 9 F.3d 1087, 1090 (4th Cir. 1993) (stating that "[a] decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court" (internal quotation marks omitted)).

Even if we possessed the authority to reject the holding of the Oken panel, we would not do so. Our careful review of the applicable law persuades us that, aside from some minor exceptions, Maryland courts consistently and regularly apply rules of waiver in capital proceedings. Cf. Meadows v. Legursky, 904 F.2d 903, 907 (4th Cir. 1990) (en banc) (explaining that consistent or regular application of a state procedural rule "does not mean undeviating adherence to such rule admitting of no exception").

**12** Baker has not attempted to demonstrate cause and prejudice or a miscarriage of justice to excuse his default.

**13** The State alternatively contends that the denial of the motion to reopen is itself a procedural default, i.e., the denial constitutes an ade-

In determining whether a claim has been exhausted, a federal court sitting in habeas must consider not merely whether the claim has been placed before the highest state court, but also whether the state court has been given a fair opportunity to review the claim. See O'Sullivan, 526 U.S. at 848 (explaining that to "protect the integrity of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies" (citation & internal quotation marks omitted)). In Castille, the Court held that a federal claim had not been exhausted even though it had been presented to the state court. Following affirmance of his convictions by a Pennsylvania appellate court, Castille raised certain claims in a petition for allocatur in the Pennsylvania Supreme Court. "Under Pennsylvania law, such allocatur review `is not a matter of right, but of sound judicial discretion, and . . . will be allowed only when there are special and important reasons therefor.'" Castille, 489 U.S. at 347 (quoting Pa. R. App. P. 1114). The petition was denied without opinion by the Pennsylvania Supreme Court. The Supreme Court held that the exhaustion requirement is not satisfied when a claim is "presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor." Id. at 351 (internal quotation marks omitted).

The State contends that Castille compels a conclusion that the claims raised in the motion to reopen were not "fairly presented" to the Maryland courts because the decision to reopen a postconviction proceeding is a discretionary one. See Md. Ann. Code art. 27, § 645A(a)(2)(iii) (Supp. 1999) ("The court may in its discretion reopen a postconviction proceeding that was previously concluded if the court determines that such action is in the interests of justice."). We disagree. Maryland law plainly establishes a right to raise new claims in a motion to reopen a previous PCR proceeding. Indeed, as

_____

quate and independent state law ground for decision. In making this argument, the State confuses the ruling with the basis for the ruling. In determining whether a claim has been defaulted, the relevant question is whether the state court has declined to consider the merits of a particular claim on the basis of a state procedural rule, not the ultimate disposition of the proceeding in which the claim was raised.

19

the district court noted, a motion to reopen is the statutorily prescribed mechanism for doing so. That the PCR court possesses discretion to decline to review such claims does not mean that they are unexhausted. Cf. O'Sullivan, 526 U.S. at 845 (holding that although petitioner had no right of review for claims raised in certiorari petition to Illinois Supreme Court, he had a right to raise those claims and thus was required to do so in order to satisfy the exhaustion requirement). Accordingly, we conclude that the claims raised in the motion to reopen were properly exhausted.

IV.

Turning at last to the merits of Baker's claims, we consider first his contention that the trial court gave the jury an unconstitutional instruction regarding reasonable doubt.[14] That instruction was as follows:

_____

[14] We note that our review of all of Baker's claims, including those raised in the motion to reopen, is governed by § 2254(d) as amended by the AEDPA. See Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir.) (holding that a summary ruling constitutes an "adjudication" within the meaning of § 2254(d)), cert. denied, 525 U.S. 925 (1998). Section 2254(d) prohibits a federal court from granting habeas relief to a state prisoner on a claim adjudicated by the state court unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d). The Supreme Court recently interpreted § 2254(d)(1) in Williams v. Taylor, 120 S. Ct. 1495, 1518-23 (2000), substantially affirming the interpretation set forth in Green v. French, 143 F.3d 865, 869-76 (4th Cir. 1998). As explained by the Williams Court, a state court decision is "contrary to" clearly established Supreme Court precedent when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 120 S. Ct. at 1523. A state court deci-

20

The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. The Defendant is not required to prove his innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. It is not a fanciful doubt, a whimsical doubt or a capricious doubt. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs.

In deciding whether a charge has been proved beyond a reasonable doubt and to a moral certainty, you may ask yourselves, "Is the evidence of guilt of the kind that I would put my trust in or rely upon in coming to a decision concerning the more important matters of my own life?" If the evidence does have the same force as information you would rely upon in such important matters, you may conclude that the charge has been proved beyond a reasonable doubt and to a moral certainty. However, if you are not satisfied of the Defendant's guilt to that extent, then reasonable doubt exists and the Defendant must be found not guilty.

J.A. 126-27. Baker contends that this instruction relieved the state of its burden to prove the elements of the charged offenses beyond a rea-

_____

sion rests on an "unreasonable application" of clearly established Supreme Court precedent when "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Because the summary denial of the motion to reopen did not articulate the basis for the rejection of Baker's claims by the PCR court, our review of those claims, while still governed by § 2254(d), necessarily requires an independent examination of the applicable law. See Wright, 151 F.3d at 157.

21

sonable doubt, mandating reversal of his convictions. See Sullivan v. Louisiana, 508 U.S. 275, 279-80 (1993) (holding that erroneous reasonable doubt instruction cannot be reviewed for harmless error).

Although due process requires that the government prove each element of an offense beyond a reasonable doubt, see In re Winship, 397 U.S. 358, 364 (1970), the Constitution neither requires that trial courts define reasonable doubt nor prohibits them from doing so, see Victor v. Nebraska, 511 U.S. 1, 5 (1994). And, when a trial court elects to define reasonable doubt, the Constitution does not mandate a particular definition. See id. Rather, the question is whether the instruction, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury. See Holland v. United States, 348 U.S. 121, 140 (1954).

We conclude that, taken as a whole, the instruction given by the trial court correctly conveyed the concept of reasonable doubt to the jury. The instruction was one of the type called "willing to act" instructions, i.e., it informed the jurors that the reasonable doubt standard is satisfied by evidence on which they would be willing to act in their personal affairs. Such instructions have been criticized by the courts. For example, in Holland the Court considered an instruction that defined reasonable doubt as "the kind of doubt . . . which you folks in the more serious and important affairs of your own lives might be willing to act upon." Id. (internal quotation marks omitted) (alteration in original). While the Court declined to declare this instruction unconstitutional, it noted that "this section of the charge should have been in terms of the kind of doubt that would make a person hesitate to act." Id.; see Monk v. Zelez, 901 F.2d 885, 890 (10th Cir. 1990) (per curiam) (holding unconstitutional a "willing to act" instruction because it was not expressed in terms of hesitation to act). However, courts have affirmed reasonable doubt instructions that informed jurors that the standard was satisfied by evidence on which they would be willing to act "without hesitation." See, e.g., United States v. Daniels, 986 F.2d 451, 457-58 (11th Cir. 1993) (per curiam).

Here, the "willing to act" language to which Baker points was given in the course of an instruction that correctly conveyed the concept of reasonable doubt to the jury. In particular, the court stated that "reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such

22

belief <u>without reservation</u> in an important matter in your own business or personal affairs." J.A. 126 (emphasis added). Accordingly, the rejection of this claim by the state court was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

V.

Finally, Baker contends that trial counsel were constitutionally deficient in numerous respects.[15] To prevail on these claims, Baker must demonstrate that his attorneys' "representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984). Review of counsel's performance is "highly deferential." <u>Id.</u> at 689. And, competency is measured against what an objectively reasonable attorney would have done under the circumstances. <u>See id.</u> at 687-88. Counsel are afforded a strong presumption that their performance was within the extremely wide range of professionally competent assistance. <u>See id.</u> at 689. For the reasons set forth below, we conclude that all of Baker's claims of ineffective assistance of counsel are without merit. Accordingly, the rejection of these claims by the state court was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

A.

Baker first contends that trial counsel were constitutionally deficient for failing to conduct an independent investigation of the case. <u>See Kimmelman v. Morrison</u>, 477 U.S. 365, 384 (1986) (stating that counsel generally is required to conduct a reasonable investigation of the case). Baker asserts that such an investigation would have uncovered the testimony of Mary Spicer, who lived near the Westview

_____

[15] Baker also claims that appellate counsel were constitutionally deficient for failing to challenge the reasonable doubt instruction on direct appeal. Because we have concluded that the challenge to the reasonable doubt instruction is without merit, it necessarily follows that counsel were not ineffective for failing to raise it. <u>See Jones v. Gibson</u>, 206 F.3d 946, 959 (10th Cir. 2000).

23

Mall. In an affidavit submitted in connection with the motion to reopen, Spicer stated that on the night of the Tyson murder she heard "several gunshots" and observed a man running away from the mall carrying a white purse. J.A. 561. Spicer stated that a blue "`Bronco'-type vehicle" picked the man up and sped away, followed by Scott Faust. Id.

Even if counsel's investigation was inadequate, the Spicer affidavit is inadequate to demonstrate prejudice. At best, Spicer's testimony would have indicated that a third individual, other than Baker and Lawrence, was involved in the crime. It would do nothing to contradict Faust's observation of a man he later identified as Baker running from the Buick to the Blazer. Indeed, Spicer's testimony would have done little, if anything, to contradict the overwhelming evidence of Baker's involvement in the crime. And, Spicer's testimony provides no assistance concerning the identity of the triggerman.

B.

Next, Baker asserts that trial counsel were ineffective for failing to investigate his codefendant, Gregory Lawrence. Baker contends that a routine investigation would have revealed that in 1978 (some 13 years before the Tyson murder), Lawrence carjacked a man at gunpoint. Lawrence locked the victim in the trunk of the car and proceeded to rob several businesses, one of which was located only one-half mile from the Westview Mall. Baker asserts that evidence of this "chillingly similar" crime would have persuaded the jury that Lawrence, rather than Baker, was the triggerman. Appellant's Brief at 34.

Again assuming that counsel were ineffective for failing to investigate Lawrence, we conclude that Baker suffered no prejudice. In the first place, the circumstances of the 1978 carjacking are not similar to the Tyson murder, much less "chillingly" so. Additionally, evidence of the 1978 crime could actually have undermined Baker's claim that he was not the triggerman, inasmuch as Lawrence did not shoot the victim of the 1978 carjacking, thus indicating a lack of a propensity to shoot a robbery victim.

C.

Baker also challenges the failure of trial counsel to obtain expert analysis of the firearms and ballistics evidence. He maintains that

24

independent analysis would have revealed that the firearm used to shoot Tyson had a trigger pull of between 1.875 and 2.5 pounds, "significantly below the minimum safe trigger pull of three pounds." Id. at 27. According to Baker, this evidence indicates a significant likelihood that the shot that killed Tyson was the result of an accidental discharge of the weapon. Baker asserts that counsel's failure to obtain and present this evidence undermines confidence in both the verdict and the sentence. With respect to the verdict, Baker maintains that the jury likely would not have convicted him of premeditated murder had it known that the fatal shot might have been accidental. With respect to his sentence, Baker claims that the trial court likely would not have sentenced him to death if it had been aware of the trigger-pull evidence.

We conclude that counsel's failure to obtain and present the trigger-pull evidence, even if deficient, did not prejudice Baker. To begin, assuming that the trigger-pull evidence would have persuaded the jury to acquit Baker of premeditated murder, this would have been at best a Pyrrhic victory. Evidence that the shot that killed Tyson might have been accidental would not undermine confidence in Baker's conviction for felony murder, a death-eligible offense. See Brooks v. State, 655 A.2d 1311, 1317 (Md. Ct. Spec. App. 1995). Moreover, the failure to present the trigger-pull evidence does not undermine our confidence in the outcome of the sentencing proceeding. In imposing the death penalty, the trial court commented at some length regarding Baker's past conduct and the circumstances of the crime, noting that "[w]hen I look at the manner in which this [crime] was carried out and the circumstances under which it was carried out, it causes me grave concern as to the threat that Mr. Baker poses to society." J.A. 237. The court also focused on Baker's conduct in planning an armed robbery and placing the gun to Tyson's head, concerns that would not be lessened by evidence that the shooting might have been accidental. There is simply no reason to think that evidence that the weapon might have accidentally discharged would have dissuaded the court from imposing the death penalty.

D.

Given the overwhelming evidence of Baker's participation in the crime, trial counsel elected not to mount a serious challenge to

25

Baker's guilt. Rather, counsel decided that the best strategy was to attempt to convince the jury that the State could not prove beyond a reasonable doubt that Baker was the one who shot Tyson, thus rendering him ineligible for the death penalty. To this end, counsel persuaded the court to have the jury render a special verdict on principalship--normally a sentencing phase issue--during the guilt phase. And, counsel's closing argument focused entirely on whether the State had proven beyond a reasonable doubt that Baker was the triggerman. Near the end of argument, counsel made the following statements:

> The State has produced evidence that Mr. Baker was present. They have introduced evidence that he was in the Blazer. The State has adduced evidence that he had blood on his sock. The State has shown you no evidence at all that Mr. Baker was the one who pulled the trigger. He is not the principal in the first degree.
>
> . . . What I have tried to do in my closing argument is not appeal to your passion or your sympathies. I have not tried to attack the Police Department of Baltimore County and tried to somehow shift the focus onto them. That's a common defense tactic. I have done it myself in other cases.
>
> When you don't have a case, you do what you can, but what I tried to do with you this morning is, as objectively as I can, go through the evidence you have in front of you. And I'm not going to stand here and insult your intelligence and tell you the State can't prove to you that Wesley Baker was there, and that Wesley Baker was in the Blazer and that Wesley Baker got arrested on Old Frederick Road. If I was going to stand up here and argue that, you would have stopped listening to me a long time ago. But what the State has not proved, and there is no evidence that you can rationally, objectively latch onto, is the fact that the State has simply not proved directly or circumstantially who shot Ms. Tyson.

Id. at 186-87 (emphasis added).

26

Baker challenges counsel's tactical decision to focus exclusively on the question of whether Baker was the triggerman, maintaining that a decision to concede guilt can never be objectively reasonable.[16] Cf. Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir. 1988) (stating that "an attorney who adopts and acts upon a belief that his client should be convicted `fail[s]' to function in any meaningful sense as the Government's adversary'" (quoting United States v. Cronic, 466 U.S. 648, 666 (1984)) (alteration in original)). Baker further claims that damage done by conceding guilt was aggravated by counsel's statement that "[w]hen you don't have a case, you do what you can." Baker claims that in making this comment counsel "disparage[d] his own candor and paint[ed] himself as a gamesman willing to `do what [he] can' in a hopeless and desperate situation." Appellant's Brief at 51.

Baker's assertion that counsel were ineffective for conceding guilt is without merit. "Our precedents plainly illustrate that counsel's concession of a client's guilt does not automatically constitute deficient performance." Young v. Catoe, 205 F.3d 750, 759 (4th Cir. 2000). We have observed that "there is a distinction which can and must be drawn between . . . a tactical retreat and . . . a complete surrender," Clozza v. Murray, 913 F.2d 1092, 1099 (4th Cir. 1990), and that "[s]ome remarks of complete concession may constitute ineffective assistance of counsel, but tactical retreats may be reasonable and necessary within the context of the entire trial, particularly when there is overwhelming evidence of the defendant's guilt," Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995). See Underwood v. Clark, 939 F.2d 473, 474 (7th Cir. 1991) (explaining that "acknowledgment [of guilt] can be a sound tactic when the evidence is indeed overwhelming (and there is no reason to suppose that any juror doubts this) and when . . . there is an advantage to be gained by winning the confidence of the jury").

_____

**16** In his brief, Baker argued at some length that counsel's decision to concede guilt in favor of challenging the State's ability to prove principalship constituted ineffective assistance of counsel. See Appellant's Brief at 48-51. At oral argument, however, counsel for Baker asserted that the decision to concede guilt was "one hundred percent defensible." Faced with the evident conflict between the statements in the brief and at oral argument, we have elected to address the issue as raised in the brief.

This court recently held that counsel was not ineffective for conceding guilt in a case similar to this one. See Young, 205 F.3d at 759-61. In Young, the defendant was charged with capital murder for shooting the victim during a robbery. The evidence that Young fired the fatal shot--which included a confession--was simply overwhelming, and counsel decided that the best strategy was to focus not on obtaining an acquittal, but rather on avoiding imposition of the death penalty. To this end, counsel conceded Young's guilt of the crime in the hope of persuading the jury that the circumstances did not warrant imposition of the death penalty. This court approved this tactic, reasoning that "it was necessary for counsel to retreat from an unlikely acquittal of a patently guilty client, so that he might attain the more realistic goal of saving the client's life." Id. at 760. Similarly, in Lingar v. Bowersox, 176 F.3d 453, 459 (8th Cir. 1999), cert. denied, 120 S. Ct. 1536 (2000), the Eighth Circuit held that counsel was not ineffective for conceding the defendant's guilt of second degree murder in favor of arguing that the defendant was too intoxicated to deliberate and thus not guilty of first degree murder. Had the jury accepted this argument, the defendant would not have been eligible for the death penalty. The court noted that "[g]iven the overwhelming evidence, Lingar could not credibly deny involvement in[the murder], and denying all involvement could inflame the jury and incite it to render a death sentence." Id. The strategy allowed counsel to retain some credibility with the jury, hopefully rendering them more sympathetic to pleas for mercy in the event of a conviction of first-degree murder.

Here, counsel's decision to concede Baker's involvement in the robbery and murder of Tyson was a reasonable tactical retreat, rather than a complete surrender. The evidence of Baker's involvement in the crime was simply overwhelming; therefore, the only strategy reasonably available to counsel was to persuade the jury that Baker was not the triggerman, and thus not eligible for the death penalty. Given that the evidence of Baker's principalship was weaker than the evidence of his involvement,[17] this strategy amounted to a reasonable

_____

[17] The evidence that Baker shot Tyson was not overwhelming. First, Adam's stipulated testimony stated that the man he saw shoot his grandmother ran to the left, i.e., the driver's side, of the Blazer. Additionally,

28

attempt "to risk losing the battle in the hope of winning the war." Young, 205 F.3d at 760.

Baker's assertion that counsel undermined their strategy of conceding guilt in order to avoid the death penalty by stating to the jury that "[w]hen you don't have a case, you do what you can" is also without merit. According to Baker, this was a concession that defense counsel had no case on the issue of principalship. The state PCR court reasoned that the statement was not a concession of principalship, but rather that counsel was saying, "[W]hen you cannot argue absolute innocence, you do what you can, and by the way the State hasn't proven that Baker was the triggerman." J.A. 493. We conclude that this is a reasonable interpretation of counsel's statement.[18] So interpreted, the statement does nothing to undermine, but rather is consistent with, counsel's strategy of attempting to persuade the jury that Baker was not the triggerman.

E.

Lastly, Baker argues that counsel were constitutionally deficient for failing to present mitigation testimony regarding Baker's family history from his mother and social worker Lori James. As noted above, during her investigation James learned from Baker's mother,

_____

Faust testified that he saw two people run from the Buick to the Blazer, and that Lawrence entered the driver's side. Finally, the fingerprints on the Buick were from Baker's right hand. If Baker were right-handed, as is the majority of the population, one must wonder how it was possible for him to hold the gun to Tyson's head and leave his fingerprints on the Buick, especially in light of the fact that the incident took only a matter of moments.

[18] We note that it is also reasonable to interpret the challenged statement in light of the remarks immediately preceding it, in which counsel referred to the "common defense tactic" of diverting the attention of the jury from the issue of guilt by appealing to prejudice or attacking the police department. Given those remarks, counsel's statement that "[w]hen you don't have a case, you do what you can" can reasonably be viewed as referring to such diversionary tactics and emphasizing to the jury that such tactics were unnecessary in this case because counsel had a strong argument that Baker was not the triggerman.

29

Dolores Williams, that Baker was the product of a rape when Williams was a teenager. Baker was first informed of this fact shortly before the sentencing hearing and, because he was unwilling to have this information revealed in open court, told his attorneys that he did not want Williams and James to testify. Baker's counsel then informed the court that Baker did not wish to present evidence of his family history in mitigation and that they had to respect that decision "man to man." Id. at 199. In order to persuade the court not to call Williams and James as court witnesses, Baker informed the court that he thought their testimony would be more damaging than helpful. Based upon this assertion, the trial court did not call Williams and James as court witnesses.

Baker now contends that it was objectively unreasonable for counsel to fail to inform him that he was the product of a rape sufficiently in advance of the sentencing proceeding to give him time to adjust. Baker further claims that counsel should have presented Williams' and James' testimony over his objection. See Brookhart v. Janis, 384 U.S. 1, 8 (1966) (opinion of Harlan, J.) ("[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval."). Even if counsel were constitutionally deficient in these respects, Baker suffered no prejudice. The trial court granted Baker's motion to reopen the sentencing proceeding and reconsidered its sentencing decision in light of James' testimony that Baker was raised in a dysfunctional family marked by poor communication, physical abuse, and drug use. The court found that this testimony was not mitigating and thus declined to change the sentence. There is no indication whatsoever that the court gave James' testimony less weight because it was presented in the context of a motion to reopen or that the court placed a heavier burden on Baker because of the previous decision to impose a death sentence.[19]

_____

[19] Moreover, there is no reason to believe that Williams' failure to testify at the reopening proceeding had any prejudicial impact. Williams' testimony would have been largely cumulative of James', which the court had found not to be mitigating. We do not believe that receiving the same information from an additional witness, even if the witness was Baker's mother, would have changed the view of the court. See Glock v. Moore, 195 F.3d 625, 635-36 (11th Cir. 1999) (holding that petitioner was not prejudiced by counsel's failure to present cumulative evidence in mitigation).

30

VI.

In sum, we conclude that Maryland has not satisfied the "opt-in" requirements of 28 U.S.C.A. § 2261, and accordingly that Baker's habeas petition was timely filed. We also determine, however, that Baker is not entitled to relief on any of his claims.[20] Therefore, we affirm the district court in all respects.

<u>AFFIRMED</u>

_____

[20] Additionally, we conclude that the district court properly denied Baker's request for an evidentiary hearing.

31